RATZLAF ET UX. *v.* UNITED STATES

No. 92–1196.   Argued November 1, 1993—Decided January 11, 1994

GINSBURG, J., delivered the opinion of the Court, in which STEVENS, SCALIA, KENNEDY, and SOUTER, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which REHNQUIST, C. J., and O'CONNOR and THOMAS, JJ., joined, *post*, p. 150.

*Stephen Robert LaCheen* argued the cause for petitioners. With him on the briefs were *Anne M. Dixon, Peter Goldberger, Pamela A. Wilk, James H. Feldman, Jr., Kevin O'Connell,* and *Christopher H. Kent.*

*Paul J. Larkin, Jr.,* argued the cause for the United States. On the brief were *Solicitor General Days, Acting Assistant Attorney General Keeney, Deputy Solicitor General Bryson, John F. Manning,* and *Richard A. Friedman.** 

JUSTICE GINSBURG delivered the opinion of the Court.

Federal law requires banks and other financial institutions to file reports with the Secretary of the Treasury whenever they are involved in a cash transaction that exceeds $10,000. 31 U. S. C. § 5313; 31 CFR § 103.22(a) (1993). It is illegal to "structure" transactions—*i. e.*, to break up a single transaction above the reporting threshold into two or more separate transactions—for the purpose of evading a financial institution's reporting requirement. 31 U. S. C. § 5324. "A person willfully violating" this antistructuring provision is subject to criminal penalties. § 5322. This case presents a question on which Courts of Appeals have divided: Does a defendant's purpose to circumvent a bank's reporting obligation suffice to sustain a conviction for "willfully violating" the antistructuring provision?[1] We hold that the "willfulness"

---

*\*Alan Zarky* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging reversal.

[1] Compare, *e. g., United States* v. *Scanio,* 900 F. 2d 485, 491 (CA2 1990) ("proof that the defendant knew that structuring is unlawful" is not re-

}

requirement mandates something more. To establish that a defendant "willfully violat[ed]" the antistructuring law, the Government must prove that the defendant acted with knowledge that his conduct was unlawful.

## I

On the evening of October 20, 1988, defendant-petitioner Waldemar Ratzlaf ran up a debt of $160,000 playing blackjack at the High Sierra Casino in Reno, Nevada. The casino gave him one week to pay. On the due date, Ratzlaf returned to the casino with cash of $100,000 in hand. A casino official informed Ratzlaf that all transactions involving more than $10,000 in cash had to be reported to state and federal authorities. The official added that the casino could accept a cashier's check for the full amount due without triggering any reporting requirement. The casino helpfully placed a limousine at Ratzlaf's disposal, and assigned an employee to accompany him to banks in the vicinity. Informed that banks, too, are required to report cash transactions in excess of $10,000, Ratzlaf purchased cashier's checks, each for less than $10,000 and each from a different bank. He delivered these checks to the High Sierra Casino.

Based on this endeavor, Ratzlaf was charged with "structuring transactions" to evade the banks' obligation to report cash transactions exceeding $10,000; this conduct, the indictment alleged, violated 31 U. S. C. §§ 5322(a) and 5324(3). The trial judge instructed the jury that the Government had to prove defendant's knowledge of the banks' reporting obligation and his attempt to evade that obligation, but did not

---

quired to satisfy § 5322's willfulness requirement), with *United States* v. *Aversa*, 984 F. 2d 493, 502 (CA1 1993) (en banc) (a "willful action" within the meaning of § 5322(a) "is one committed in violation of a known legal duty or in consequence of a defendant's reckless disregard of such a duty").

have to prove defendant knew the structuring was unlawful. Ratzlaf was convicted, fined, and sentenced to prison.[2]

Ratzlaf maintained on appeal that he could not be convicted of "willfully violating" the antistructuring law solely on the basis of his knowledge that a financial institution must report currency transactions in excess of $10,000 and his intention to avoid such reporting. To gain a conviction for "willful" conduct, he asserted, the Government must prove he was aware of the illegality of the "structuring" in which he engaged. The Ninth Circuit upheld the trial court's construction of the legislation and affirmed Ratzlaf's conviction. 976 F. 2d 1280 (1992). We granted certiorari, 507 U. S. 1050 (1993), and now conclude that, to give effect to the statutory "willfulness" specification, the Government had to prove Ratzlaf knew the structuring he undertook was unlawful. We therefore reverse the judgment of the Court of Appeals.

## II

### A

Congress enacted the Currency and Foreign Transactions Reporting Act (Bank Secrecy Act) in 1970, Pub. L. 91–2508, Tit. II, 84 Stat. 1118, in response to increasing use of banks and other institutions as financial intermediaries by persons engaged in criminal activity. The Act imposes a variety of reporting requirements on individuals and institutions regarding foreign and domestic financial transactions. See 31 U. S. C. §§ 5311–5325. The reporting requirement relevant here, § 5313(a), applies to domestic financial transactions. Section 5313(a) reads:

"When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of

---

[2] Ratzlaf's wife and the casino employee who escorted Ratzlaf to area banks were codefendants. For convenience, we refer only to Waldemar Ratzlaf in this opinion.

United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. . . ."[3]

To deter circumvention of this reporting requirement, Congress enacted an antistructuring provision, 31 U. S. C. § 5324, as part of the Money Laundering Control Act of 1986, Pub. L. 99–570, Tit. I, Subtit. H, § 1354(a), 100 Stat. 3207–22.[4] Section 5324,[5] which Ratzlaf is charged with "willfully violating," reads:

"No person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction—

.           .           .           .           .

---

[3] By regulation, the Secretary ordered reporting of "transaction[s] in currency of more than $10,000." 31 CFR § 103.22(a) (1993). Although the Secretary could have imposed a report-filing requirement on "any . . . participant in the transaction," 31 U. S. C. § 5313(a), the Secretary chose to require reporting by the financial institution but not by the customer. 31 CFR § 103.22(a) (1993).

[4] Other portions of this Act make "money laundering" itself a crime. See Pub. L. 99–570, Tit. XIII, § 1352(a), 100 Stat. 3207–18, codified at 18 U. S. C. § 1956(a)(2)(b) (prohibiting various transactions involving the "proceeds of some form of unlawful activity"). The Government does not assert that Ratzlaf obtained the cash used in any of the transactions relevant here in other than a lawful manner.

[5] Subsequent to Ratzlaf's conviction, Congress recodified § 5324(1)–(3) as § 5324(a)(1)–(3), without substantive change. In addition, Congress added subsection (b) to replicate the prohibitions of subsection (a) in the context of international currency transactions. See Annunzio-Wylie Anti-Money Laundering Act, Pub. L. 102–550, Tit. XV, § 1525(a), 106 Stat. 4064, 31 U. S. C. § 5324 (1988 ed., Supp. IV). For simplicity, we refer to the codification in effect at the time the Court of Appeals decided this case.

> "(3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions."[6]

The criminal enforcement provision at issue, 31 U. S. C. § 5322(a), sets out penalties for "[a] person willfully violating," *inter alia,* the antistructuring provision. Section 5322(a) reads:

> "A person willfully violating this subchapter [31 U. S. C. § 5311 *et seq.*] or a regulation prescribed under this subchapter (except section 5315 of this title or a regulation prescribed under section 5315) shall be fined not more than $250,000, or [imprisoned for] not more than five years, or both."

### B

Section 5324 forbids structuring transactions with a "purpose of evading the reporting requirements of section 5313(a)." Ratzlaf admits that he structured cash transactions, and that he did so with knowledge of, and a purpose to avoid, the banks' duty to report currency transactions in excess of $10,000. The statutory formulation (§ 5322) under which Ratzlaf was prosecuted, however, calls for proof of "willful[ness]" on the actor's part. The trial judge in Ratzlaf's case, with the Ninth Circuit's approbation, treated § 5322(a)'s "willfulness" requirement essentially as surplusage—as words of no consequence.[7] Judges should hesitate so to treat statutory terms in any setting, and resistance

---

[6] Regarding enforcement of § 5324, the Secretary considered, but did not promulgate, a regulation requiring banks to inform currency transaction customers of the section's proscription. See 53 Fed. Reg. 7948 (1988) (proposing "procedures to notify [bank] customers of the provisions to Section 5324" in order to "insure compliance" with those provisions); 54 Fed. Reg. 20398 (1989) (withdrawing proposal).

[7] The United States confirmed at oral argument that, in its view, as in the view of the courts below, "the 5324 offense is just what it would be if you never had 5322." Tr. of Oral Arg. 23.

should be heightened when the words describe an element of a criminal offense. See *Pennsylvania Dept. of Public Welfare* v. *Davenport*, 495 U. S. 552, 562 (1990) (expressing "deep reluctance" to interpret statutory provisions "so as to render superfluous other provisions in the same enactment") (citation omitted); cf. *Potter* v. *United States*, 155 U. S. 438, 446 (1894) (word "wilful" used to describe certain offenses but not others in same statute "cannot be regarded as mere surplusage; it means something").

"Willful," this Court has recognized, is a "word of many meanings," and "its construction [is] often . . . influenced by its context." *Spies* v. *United States*, 317 U. S. 492, 497 (1943). Accordingly, we view §§ 5322(a) and 5324(3) mindful of the complex of provisions in which they are embedded. In this light, we count it significant that § 5322(a)'s omnibus "willfulness" requirement, when applied to other provisions in the same subchapter, consistently has been read by the Courts of Appeals to require both "knowledge of the reporting requirement" *and* a "specific intent to commit the crime," *i. e.*, "a purpose to disobey the law." See *United States* v. *Bank of New England, N. A.*, 821 F. 2d 844, 854–859 (CA1 1987) ("willful violation" of § 5313's reporting requirement for cash transactions over $10,000 requires "voluntary, intentional, and bad purpose to disobey the law"); *United States* v. *Eisenstein*, 731 F. 2d 1540, 1543 (CA11 1984) ("willful violation" of § 5313's reporting requirement for cash transactions over $10,000 requires " 'proof of the defendant's knowledge of the reporting requirement and his specific intent to commit the crime' ") (quoting *United States* v. *Granda*, 565 F. 2d 922, 926 (CA5 1978)).

Notable in this regard are 31 U. S. C. § 5314,[8] concerning records and reports on monetary transactions with foreign

---

[8] Section 5314 provides that "the Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency."

financial agencies, and § 5316,[9] concerning declaration of the transportation of more than $10,000 into, or out of, the United States. Decisions involving these provisions describe a "willful" actor as one who violates "a known legal duty." See, e. g., *United States* v. *Sturman*, 951 F. 2d 1466, 1476–1477 (CA6 1991) ("willful violation" of § 5314's reporting requirement for foreign financial transactions requires proof of "'voluntary, intentional violation of a known legal duty'") (quoting *Cheek* v. *United States*, 498 U. S. 192, 201 (1991)); *United States* v. *Warren*, 612 F. 2d 887, 890 (CA5 1980) ("willful violation" of § 5316's reporting requirement for transportation of currency across international boundaries requires that defendant "have *actually known* of the currency reporting requirement and have voluntarily and intentionally violated that known legal duty"); *United States* v. *Dichne*, 612 F. 2d 632, 636 (CA2 1979) ("willful violation" of § 5316's reporting requirement for transportation of currency across international boundaries requires proof of defendant's "'knowledge of the reporting requirement and his specific intent to commit the crime'") (quoting *Granda*, 565 F. 2d, at 926); *Granda*, 565 F. 2d, at 924–926 (overturning conviction for "willful violation" of § 5316 because jury was not given "proper instruction [that] would include some discussion of defendant's ignorance of the law" and rejecting Government's contention that the statutory provisions "do not require that the defendant be aware of the fact that he is breaking the law").[10]

---

[9] Section 5316 requires the filing of reports prescribed by the Secretary of the Treasury when "a person or an agent or bailee of the person . . . knowingly (1) transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time" into, or out of, the United States.

[10] "[S]pecific intent to commit the crime[s]" described in 31 U. S. C. §§ 5313, 5314, and 5316 might be negated by, e. g., proof that defendant relied in good faith on advice of counsel. See *United States* v. *Eisenstein*, 731 F. 2d 1540, 1543–1544 (CA11 1984).

A term appearing in several places in a statutory text is generally read the same way each time it appears. See *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U. S. 469, 479 (1992). We have even stronger cause to construe a *single* formulation, here § 5322(a), the same way each time it is called into play. See *United States* v. *Aversa*, 984 F. 2d 493, 498 (CA1 1993) (en banc) ("Ascribing various meanings to a single iteration of [§ 5322(a)'s willfulness requirement]— reading the word differently for each code section to which it applies—would open Pandora's jar. If courts can render meaning so malleable, the usefulness of a single penalty provision for a group of related code sections will be eviscerated and . . . almost any code section that references a group of other code sections would become susceptible to individuated interpretation.").

The United States urges, however, that § 5324 violators, by their very conduct, exhibit a purpose to do wrong, which suffices to show "willfulness":

> "On occasion, criminal statutes—including some requiring proof of 'willfulness'—have been understood to require proof of an intentional violation of a known legal duty, *i. e.*, specific knowledge by the defendant that his conduct is unlawful. But where that construction has been adopted, it has been invoked only to ensure that the defendant acted with a wrongful purpose. See *Liparota* v. *United States*, 471 U. S. 419, 426 (1985) . . . .

> "The anti-structuring statute, 31 U. S. C. § 5324, satisfies the 'bad purpose' component of willfulness by explicitly defining the wrongful purpose necessary to violate the law: it requires proof that the defendant acted with the purpose to evade the reporting requirement of Section 5313(a)." Brief for United States 23–25.

" '[S]tructuring is not the kind of activity that an ordinary person would engage in innocently,'" the United States asserts. *Id.*, at 29 (quoting *United States* v. *Hoyland,* 914 F. 2d 1125, 1129 (CA9 1990)). It is therefore "reasonable," the Government concludes, "to hold a structurer responsible for evading the reporting requirements without the need to prove specific knowledge that such evasion is unlawful." Brief for United States 29.

Undoubtedly there are bad men who attempt to elude official reporting requirements in order to hide from Government inspectors such criminal activity as laundering drug money or tax evasion.[11] But currency structuring is not inevitably nefarious. Consider, for example, the small business operator who knows that reports filed under 31 U. S. C. § 5313(a) are available to the Internal Revenue Service. To reduce the risk of an IRS audit, she brings $9,500 in cash to the bank twice each week, in lieu of transporting over $10,000 once each week. That person, if the United States is right, has committed a criminal offense, because she structured cash transactions "for the specific purpose of depriving the Government of the information that Section 5313(a) is designed to obtain." Brief for United States 28–

---

[11] On brief, the United States attempted to link Ratzlaf to other bad conduct, describing at some length his repeated failure to report gambling income in his income tax returns. Brief for United States 5–7. Ratzlaf was not prosecuted, however, for these alleged misdeeds. Tr. of Oral Arg. 35–36. Nor has the Government ever asserted that Ratzlaf was engaged in other conduct Congress sought principally to check through the legislation in question—not gambling at licensed casinos, but laundering money proceeds from drug sales or other criminal ventures. See S. Rep. No. 99–433, pp. 1–2 (1986) (purpose of Act creating § 5324 is to "provide Federal law enforcement agencies with additional tools to investigate money laundering [and to] curb the spread of money laundering, by which criminals have successfully disguised the nature and source of funds from their illegal enterprises").

29.[12]  Nor is a person who structures a currency transaction invariably motivated by a desire to keep the Government in the dark.  But under the Government's construction an individual would commit a felony against the United States by making cash deposits in small doses, fearful that the bank's reports would increase the likelihood of burglary,[13] or in an endeavor to keep a former spouse unaware of his wealth.[14]

Courts have noted "many occasions" on which persons, without violating any law, may structure transactions "in order to avoid the impact of some regulation or tax." *United States* v. *Aversa,* 762 F. Supp. 441, 446 (NH 1991), aff'd in part, 984 F. 2d 493 (CA1 1993).  This Court, over a century ago, supplied an illustration:

> "The Stamp Act of 1862 imposed a duty of two cents upon a bank-check, when drawn for an amount not less than twenty dollars.  A careful individual, having the amount of twenty dollars to pay, pays the same by handing to his creditor two checks of ten dollars each.  He thus draws checks in payment of his debt to the amount

---

[12] At oral argument, the United States recognized that, under its reading of the legislation, the entrepreneur in this example, absent special exemption, would be subject to prosecution.  Tr. of Oral Arg. 32–34.

[13] See *United States* v. *Dollar Bank Money Market Account No. 1591768456,* 980 F. 2d 233, 241 (CA3 1992) (forfeiture action under 18 U. S. C. §981(a)(1)(A) involving a cash gift deposited by the donee in several steps to avoid bank's reporting requirement; court overturned grant of summary judgment in Government's favor, noting that jury could believe donee's "legitimate explanations for organizing his deposits in amounts under $10,000," including respect for donor's privacy and fear that information regarding the donor—an "eccentric old woman [who] hid hundreds of thousands of dollars in her house"—might lead to burglary attempts).

[14] See *Aversa,* 984 F. 2d, at 495 (real estate partners feared that "paper trail" from currency transaction reports would obviate efforts to hide existence of cash from spouse of one of the partners).

of twenty dollars, and yet pays no stamp duty. . . . While his operations deprive the government of the duties it might reasonably expect to receive, it is not perceived that the practice is open to the charge of fraud. He resorts to devices to avoid the payment of duties, but they are not illegal. He has the legal right to split up his evidences of payment, and thus to avoid the tax." *United States* v. *Isham,* 17 Wall. 496, 506 (1873).

In current days, as an *amicus* noted, countless taxpayers each year give a gift of $10,000 on December 31 and an identical gift the next day, thereby legitimately avoiding the taxable gifts reporting required by 26 U. S. C. §2503(b).[15] See Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 16.

In light of these examples, we are unpersuaded by the argument that structuring is so obviously "evil" or inherently "bad" that the "willfulness" requirement is satisfied irrespective of the defendant's knowledge of the illegality of structuring. Had Congress wished to dispense with the requirement, it could have furnished the appropriate instruction.[16]

## C

In §5322, Congress subjected to criminal penalties only those "willfully violating" §5324, signaling its intent to require for conviction proof that the defendant knew not only

---

[15] The statute provides that "[i]n the case of gifts . . . made to any person by [a] donor during [a] calendar year, the first $10,000 of such gifts to such person shall not . . . be included in the total amount of gifts made during such year." 26 U. S. C. §2503(b).

[16] Congress did provide for civil forfeiture without any "willfulness" requirement in the Money Laundering Control Act of 1986. See 18 U. S. C. §981(a) (subjecting to forfeiture "[a]ny property, real or personal, involved in a transaction . . . in violation of section 5313(a) or 5324(a) of title 31 . . ."); see also 31 U. S. C. §5317(a) (subjecting to forfeiture any "monetary instrument . . . being transported [when] a report on the instrument under section 5316 of this title has not been filed or contains a material omission or misstatement").

of the bank's duty to report cash transactions in excess of $10,000, but also of his duty not to avoid triggering such a report. There are, we recognize, contrary indications in the statute's legislative history.[17] But we do not resort to legis-

---

[17] The United States points to one of the Senate Reports accompanying the Money Laundering Control Act of 1986, which stated that "a person who converts $18,000 in currency to cashier's checks by purchasing two $9,000 cashier's checks at two different banks or on two different days with the specific intent that the participating bank or banks not be required to file Currency Transaction Reports for those transactions, would be subject to potential civil and criminal liability." S. Rep. No. 99–433, p. 22 (1986), cited in Brief for United States 35. The same Report also indicated that § 5324 "would codify [*United States* v.] *Tobon-Builes*[, 706 F. 2d 1092 (CA11 1983),] and like cases [by] expressly subject[ing] to potential liability a person who causes or attempts to cause a financial institution to fail to file a required report or who causes a financial institution to file a required report that contains material omissions or misstatements of fact." S. Rep. No. 99–433, at 22, cited in Brief for United States 33.

But the legislative history cited by the United States is hardly crystalline. The reference to *United States* v. *Tobon-Builes*, 706 F. 2d 1092 (CA11 1983), is illustrative. In that case, the defendant was charged under 18 U. S. C. § 1001, the False Statements Act, with "conceal[ing] . . . the existence, source, and transfer of approximately $185,200 in cash by purchasing approximately twenty-one cashier's checks in amounts less than $10,000 [and] using a variety of names, including false names . . . ." 706 F. 2d, at 1094. The defendant's "main contention," rejected by the Eleventh Circuit, was that he "could not have violated the concealment prohibition of § 1001 because he was under no legal duty to report any of his cash transactions." *Id.*, at 1096. No "ignorance of the law" defense was asserted. Congress may indeed have "codified" that decision in § 5324 by "expressly subject[ing] to potential liability a person who causes or attempts to cause a financial institution to fail to file a required report or who causes a financial institution to file a required report that contains material omissions or misstatements of fact," S. Rep. No. 99–433, at 22, but it appears that Congress did so in the *first* and *second* subsections of § 5324, which track the Senate Report language almost verbatim. See 31 U. S. C. § 5324(1) (no person shall "cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a)"); 31 U. S. C. § 5324(2) (no person shall "cause or attempt to cause a domestic financial institution to file a report required under section 5313(a) that contains a material omission or misstatement of fact"). Indeed, the Senate Report stated that *"[i]n addition"* to codifying *Tobon-Builes*, § 5324

lative history to cloud a statutory text that is clear.[18]  Moreover, were we to find § 5322(a)'s "willfulness" requirement ambiguous as applied to § 5324, we would resolve any doubt in favor of the defendant.  *Hughey* v. *United States*, 495 U. S. 411, 422 (1990) (lenity principles "demand resolution of ambiguities in criminal statutes in favor of the defendant"); *Crandon* v. *United States*, 494 U. S. 152, 160 (1990) ("Because construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text."); *United States* v. *Bass*, 404 U. S. 336, 347–350 (1971) (rule of lenity premised on concepts that " 'fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed' " and that "legislatures and not courts should define

would also "create the offense of structuring a transaction to evade the reporting requirements."  S. Rep. No. 99–433, at 22.  The relevance of *Tobon-Builes* to the proper construction of § 5324(3), the subsection under which Ratzlaf was convicted, is not evident.

[18] See *Barnhill* v. *Johnson*, 503 U. S. 393, 401 (1992) (appeals to legislative history are well taken only to resolve statutory ambiguity).  See also *United States* v. *Aversa*, 984 F. 2d, at 499, n. 8 (commenting that legislative history of provisions here at issue " 'is more conflicting than the [statutory] text is ambiguous' ") (quoting *Wong Yang Sung* v. *McGrath*, 339 U. S. 33, 49 (1950)).  As the First Circuit noted, no House, Senate, or Conference Report accompanied the final version of the Anti-Drug Abuse Act of 1986; instead, over 20 separate reports accompanied various proposed bills, portions of which were incorporated into that Act.  See 1986 U. S. C. C. A. N. 5393 (listing reports).

The dissent, see *post*, at 161, features a House Report issued in 1991 in connection with an unenacted version of the Annunzio-Wylie Anti-Money Laundering Act.  We do not find that Report, commenting on a bill that did not pass, a secure indicator of congressional intent at any time, and it surely affords no reliable guide to Congress' intent in 1986.  See *Oscar Mayer & Co.* v. *Evans*, 441 U. S. 750, 758 (1979) (cautioning against giving weight to "history" written years after the passage of a statute).

criminal activity") (quoting *McBoyle* v. *United States*, 283 U. S. 25, 27 (1931) (Holmes, J.)).

We do not dishonor the venerable principle that ignorance of the law generally is no defense to a criminal charge. See *Cheek* v. *United States*, 498 U. S. 192, 199 (1991); *Barlow* v. *United States*, 7 Pet. 404, 410–412 (1833) (Story, J.). In particular contexts, however, Congress may decree otherwise. That, we hold, is what Congress has done with respect to 31 U. S. C. § 5322(a) and the provisions it controls. To convict Ratzlaf of the crime with which he was charged, violation of 31 U. S. C. §§ 5322(a) and 5324(3), the jury had to find he knew the structuring in which he engaged was unlawful.[19] Because the jury was not properly instructed in this regard, we reverse the judgment of the Ninth Circuit and remand this case for further proceedings consistent with this opinion.

*It is so ordered.*

---

[19] The dissent asserts that our holding "largely nullifies the effect" of § 5324 by "mak[ing] prosecution for structuring difficult or impossible in most cases." See *post*, at 161, 162. Even under the dissent's reading of the statute, proof that the defendant knew of the bank's duty to report is required for conviction; we fail to see why proof that the defendant knew of his duty to refrain from structuring is so qualitatively different that it renders prosecution "impossible." A jury may, of course, find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct, see *Spies* v. *United States*, 317 U. S. 492, 499–500 (1943) (illustrating conduct that can support permissible inference of an "affirmative willful attempt" to evade a tax); *United States* v. *Bank of New England, N. A.*, 821 F. 2d 844, 854 (CA1 1987) (willfulness "is usually established by drawing reasonable inferences from the available facts"), and the Government has not found it "impossible" to persuade a jury to make such inferences in prosecutions for willful violations of §§ 5313, 5314, or 5316. See, *e. g.*, *United States* v. *Dichne*, 612 F. 2d 632, 636–638 (CA2 1979) (evidence that Government took "affirmative steps" to bring the reporting requirement to the defendant's attention by means of visual notices supports inference that defendant "willfully violated" § 5316).

JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE THOMAS join, dissenting.

On October 27, 1988, petitioner Waldemar Ratzlaf[1] arrived at a Nevada casino with a shopping bag full of cash to pay off a $160,000 gambling debt. He told casino personnel he did not want any written report of the payment to be made. The casino vice president informed Ratzlaf that he could not accept a cash payment of more than $10,000 without filing a report.

Ratzlaf, along with his wife and a casino employee, then proceeded to visit several banks in and around Stateline, Nevada, and South Lake Tahoe, California, purchasing separate cashier's checks, each in the amount of $9,500. At some banks the Ratzlafs attempted to buy two checks—one for each of them—and were told that a report would have to be filed; on those occasions they canceled the transactions. Ratzlaf then returned to the casino and paid off $76,000 of his debt in cashier's checks. A few weeks later, Ratzlaf gave three persons cash to purchase additional cashier's checks in amounts less than $10,000. The Ratzlafs themselves also bought five more such checks in the course of a week.

A jury found beyond a reasonable doubt that Ratzlaf knew of the financial institutions' duty to report cash transactions in excess of $10,000 and that he structured transactions for the specific purpose of evading the reporting requirements.

The Court today, however, concludes that these findings are insufficient for a conviction under 31 U. S. C. §§ 5322(a) and 5324(3),[2] because a defendant also must have known that the structuring in which he engaged was illegal. Because this conclusion lacks support in the text of the statute, conflicts in my view with basic principles governing the inter-

---

[1] For convenience, I follow the majority, see *ante*, at 138, n. 2, and refer only to Waldemar Ratzlaf in this opinion.

[2] As does the majority, I refer to the codification in effect at the time the Court of Appeals decided this case. See *ante*, at 139, n. 5.

pretation of criminal statutes, and is squarely undermined by the evidence of congressional intent, I dissent.

## I

"The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." *Cheek* v. *United States*, 498 U. S. 192, 199 (1991). The Court has applied this common-law rule "in numerous cases construing criminal statutes." *Ibid.*, citing *United States* v. *International Minerals & Chemical Corp.*, 402 U. S. 558 (1971); *Hamling* v. *United States*, 418 U. S. 87, 119–124 (1974); and *Boyce Motor Lines, Inc.* v. *United States*, 342 U. S. 337 (1952).

Thus, the term "willfully" in criminal law generally "refers to consciousness of the act but not to consciousness that the act is unlawful." *Cheek*, 498 U. S., at 209 (SCALIA, J., concurring in judgment); see also *Browder* v. *United States*, 312 U. S. 335, 341 (1941); *Potter* v. *United States*, 155 U. S. 438, 446 (1894); *American Surety Co. of New York* v. *Sullivan*, 7 F. 2d 605, 606 (CA2 1925) (L. Hand, J.) ("[T]he word 'willful' . . . means no more than that the person charged with the duty knows what he is doing," not that "he must suppose that he is breaking the law"); American Law Institute, Model Penal Code § 2.02(8) (1985) ("A requirement that an offense be committed wilfully is satisfied if a person acts knowingly with respect to the material elements of the offense, unless a purpose to impose further requirements appears").

As the majority explains, 31 U. S. C. § 5322(a), originally enacted in 1970, imposes criminal penalties upon "person[s] willfully violating this subchapter." The subchapter (entitled "Records and Reports on Monetary Instruments Transactions") contains several different reporting requirements, including § 5313, which requires financial institutions to file reports for cash transactions over an amount prescribed by regulation; § 5314, which requires reports for transactions with foreign financial agencies; and § 5316, which requires

reports for transportation of more than $10,000 into or out of the United States. In 1986, Congress added § 5324 to the subchapter to deter rampant evasion by customers of financial institutions' duty to report large cash transactions. See *infra,* at 162, and n. 13. The new section provides: "No person shall for the purpose of evading the reporting requirements of section 5313(a) . . . (3) structure . . . any transaction with one or more domestic financial institutions."

Unlike other provisions of the subchapter, the antistructuring provision identifies the purpose that is required for a § 5324 violation: "evading the reporting requirements." The offense of structuring, therefore, requires (1) *knowledge* of a financial institution's reporting requirements, and (2) the structuring of a transaction for the *purpose* of evading those requirements. These elements define a violation that is "willful" as that term is commonly interpreted. The majority's additional requirement that an actor have actual knowledge *that structuring is prohibited* strays from the statutory text, as well as from our precedents interpreting criminal statutes generally and "willfulness" in particular.

The Court reasons that the interpretation of the Court of Appeals for the Ninth Circuit, and that of nine other Circuits,[3] renders § 5322(a)'s willfulness requirement superfluous. See *ante,* at 140. This argument ignores the general-

---

[3] See *United States* v. *Scanio,* 900 F. 2d 485, 489–492 (CA2 1990); *United States* v. *Shirk,* 981 F. 2d 1382, 1389–1392 (CA3 1993); *United States* v. *Rogers,* 962 F. 2d 342, 343–345 (CA4 1992); *United States* v. *Beaumont,* 972 F. 2d 91, 93–95 (CA5 1992); *United States* v. *Baydoun,* 984 F. 2d 175, 180 (CA6 1993); *United States* v. *Jackson,* 983 F. 2d 757, 767 (CA7 1993); *United States* v. *Gibbons,* 968 F. 2d 639, 643–645 (CA8 1992); *United States* v. *Dashney,* 937 F. 2d 532, 537–540 (CA10), cert. denied, 502 U. S. 951 (1991); *United States* v. *Brown,* 954 F. 2d 1563, 1567–1569 (CA11), cert. denied, 506 U. S. 900 (1992).

The only Court of Appeals to adopt a contrary interpretation is the First Circuit, and even that court allows "reckless disregard" of one's legal duty to support a conviction for structuring. See *United States* v. *Aversa,* 984 F. 2d 493, 502 (1993) (en banc).

ity of § 5322(a), which sets a single standard—willfulness—
for the subchapter's various reporting provisions. Some of
those provisions do not themselves define willful conduct, so
the willfulness element cannot be deemed surplusage. More-
over, the fact that § 5322(a) requires willfulness for criminal
liability to be imposed does not mean that each of the under-
lying offenses to which it applies must involve something less
than willfulness. Thus, the fact that § 5324 *does* describe a
"willful" offense, since it already requires "the purpose of
evading the reporting requirements," provides no basis for
imposing an artificially heightened scienter requirement.

The majority also contends that § 5322(a)'s willfulness ele-
ment, when applied to the subchapter's other provisions, has
been read by the Courts of Appeals to require knowledge of
and a purpose to disobey the law. See *ante,* at 141–142. In
fact, the cases to which the majority refers stand for the more
subtle proposition that a willful violation requires knowledge
of the pertinent reporting requirements and a purpose to
avoid compliance with them.[4] Consistent with and in light

---

[4] The dominant formulation of the standard for a willful violation of the
related provisions demands "proof of the defendant's knowledge of the
reporting requirement and his specific intent to commit the crime."
*United States* v. *Granda,* 565 F. 2d 922, 926 (CA5 1978); see also *United
States* v. *Bank of New England, N. A.,* 821 F. 2d 844, 854 (CA1) ("willful"
violation of § 5313 requires " 'knowledge of the reporting requirements and
[defendant's] specific intent to commit the crime' "), cert. denied, 484 U. S.
943 (1987); *United States* v. *Eisenstein,* 731 F. 2d 1540, 1543 (CA11 1984)
(same); *United States* v. *Dichne,* 612 F. 2d 632, 636 (CA2 1979) (same stand-
ard under predecessor to § 5316), cert. denied, 445 U. S. 928 (1980); *United
States* v. *Schnaiderman,* 568 F. 2d 1208, 1211 (CA5 1978) (same). The
term "specific intent" does not, as the majority appears to assume, import
the notion of knowledge of illegality. Rather, that term generally corres-
ponds to the concept of "purpose," see *United States* v. *Bailey,* 444 U. S.
394, 405 (1980), and it does not add to the requisite *knowledge,* which is
specified in the first prong of the standard. The majority correctly notes
that courts in a few instances have referred to a willful violation of the
reporting provisions as involving violation of a "known legal duty."
Those courts, however, either applied the standard from *Cheek* v. *United*

154

of that construction, Congress' 1986 enactment prohibited structuring "for the purpose of evading the reporting requirements." The level of knowledge imposed by the term "willfully" as it applies to all the underlying offenses in the subchapter on reporting requirements is "knowledge of the reporting requirements."[5]

The Court next concludes that its interpretation of "willfully" is warranted because structuring is not inherently "nefarious." See *ante*, at 144. It is true that the Court, on occasion, has imposed a knowledge-of-illegality requirement upon criminal statutes to ensure that the defendant acted with a wrongful purpose. See, *e. g., Liparota* v. *United*

---

*States*, 498 U. S. 192, 200 (1991), despite this Court's restriction of that standard's application to the tax context, see *United States* v. *Sturman*, 951 F. 2d 1466, 1476 (CA6 1991), or were referring simply to the reporting requirements as the "law" that one must know and actually applied the dominant standard from *Granda*, see *Bank of New England*, 821 F. 2d, at 854; *United States* v. *Warren*, 612 F. 2d 887, 890 (CA5 1980). This understanding is supported by *Granda*'s statement that "the proper instruction would include some discussion of the defendant's ignorance of the law since the defendant's alleged *ignorance of the reporting requirements* goes to the heart of his or her denial of the specific intent necessary to commit the crime." 565 F. 2d, at 926 (emphasis added).

[5] "Knowledge of the reporting requirements" is easily confused with "knowledge of illegality" because, in the context of the other reporting provisions—§§ 5313, 5314, and 5316—the entity that can "willfully violate" each provision is also the entity charged with the reporting duty; as a result, a violation with "knowledge of the reporting requirements" necessarily entails the entity's knowledge of the illegality of its conduct (that is, its failure to file a required report). In contrast, § 5324 prohibits a customer from purposefully evading a *bank's* reporting requirements, so knowledge of the reporting requirements does not collapse into actual knowledge that the customer's own conduct is prohibited. Under the cases interpreting the statute as well as fundamental principles of criminal law, it is one's knowledge of the reporting requirements, not "knowledge of the illegality of one's conduct," that makes a violation "willful." Moreover, as explained below, Congress in 1992 rejected the majority's construction when it enacted a parallel antistructuring provision for attempts to evade § 5316's reporting requirements. See *infra*, at 161–162.

*States*, 471 U. S. 419, 426 (1985). I cannot agree, however, that the imposition of such a requirement is necessary here. First, the conduct at issue—splitting up transactions involving tens of thousands of dollars in cash for the specific purpose of circumventing a bank's reporting duty—is hardly the sort of innocuous activity involved in cases such as *Liparota*, in which the defendant had been convicted of fraud for purchasing food stamps for less than their face value. Further, an individual convicted of structuring is, by definition, aware that cash transactions are regulated, and he cannot seriously argue that he lacked notice of the law's intrusion into the particular sphere of activity. Cf. *Lambert* v. *California*, 355 U. S. 225, 229 (1957). By requiring knowledge of a bank's reporting requirements as well as a "purpose of evading" those requirements, the antistructuring provision targets those who knowingly act to deprive the Government of information to which it is entitled. In my view, that is not so plainly innocent a purpose as to justify reading into the statute the additional element of knowledge of illegality.[6] In

---

[6] The question is not whether structuring is "so obviously 'evil' or inherently 'bad' that the 'willfulness' requirement is satisfied irrespective of the defendant's knowledge of the illegality of structuring." *Ante*, at 146. The general rule is that "willfulness" does *not* require knowledge of illegality; the inquiry under exceptional cases such as *Liparota* v. *United States*, 471 U. S. 419 (1985), is whether the statute criminalizes "a broad range of apparently innocent conduct," *id.*, at 426, such that it requires no element of wrongfulness.

The majority expresses concern about the potential application of the antistructuring law to a business operator who deposits cash twice each week to reduce the risk of an IRS audit. See *ante*, at 144–145. First, it is not at all clear that the statute would apply in this situation. If a person has legitimate business reasons for conducting frequent cash transactions, or if the transactions genuinely can be characterized as separate, rather than artificially structured, then the person is not engaged in "structuring" for the purpose of "evasion." See *United States* v. *Brown*, 954 F. 2d, at 1571; S. Rep. No. 99–433, p. 22 (1986). Even if application of § 5324 were theoretically possible in this extreme situation, the example would not establish prohibition of a "broad range of apparently innocent conduct"

any event, Congress has determined that purposefully structuring transactions is not innocent conduct.[7]

In interpreting federal criminal tax statutes, this Court has defined the term "willfully" as requiring the " 'voluntary, intentional violation of a known legal duty.'" *Cheek* v. *United States,* 498 U. S., at 200, quoting *United States* v. *Bishop,* 412 U. S. 346, 360 (1973); see also *United States* v. *Murdock,* 290 U. S. 389, 394–396 (1933). Our rule in the tax area, however, is an "exception to the traditional rule," applied "largely due to the complexity of the tax laws." *Cheek,* 498 U. S., at 200; see also *Browder* v. *United States,* 312 U. S., at 341–342. The rule is inapplicable here, where, far from being complex, the provisions involved are perhaps among the simplest in the United States Code.[8]

---

as in *Liparota,* 471 U. S., at 426, and it would not justify reading into the statute a knowledge-of-illegality requirement.

[7] "[The antistructuring provision] requires proof beyond a reasonable doubt that the purpose of the 'structured' aspect of a currency exchange was to evade the reporting requirements of the Bank Secrecy Act. It is this requirement which shields innocent conduct from prosecution." Hearing on S. 571 and S. 2306 before the Senate Committee on Banking, Housing, and Urban Affairs, 99th Cong., 2d Sess., 136–137 (1986) (response of Deputy Asst. Atty. Gen. Knapp and Asst. U. S. Atty. Sun to written question of Sen. D'Amato).

[8] The majority offers examples of tax "avoidance" as further evidence of the apparent "innocence" of structuring transactions to evade the reporting requirements. See *ante,* at 145–146. These examples are inapposite because Congress specifically has prohibited the structuring of transactions to evade the reporting requirements. Indeed, its use of the word "evading" in § 5324 reveals that Congress deemed the intent to circumvent those requirements a "bad purpose." Moreover, the analogy to the tax field is flawed. Tax law involves a unique scheme consisting of myriad categories and thresholds, applied in yearly segments, designed to generate appropriate levels of taxation while also influencing behavior in various ways. Innocent "avoidance" is an established part of this scheme, and it does not operate to undermine the purposes of the tax law. In sharp contrast, evasion of the currency transaction reporting requirements completely deprives the Government of the information that those requirements are designed to obtain, and thus wholly undermines the purpose of the statute.

## II

Although I believe the statutory language is clear in light of our precedents, the legislative history confirms that Congress intended to require knowledge of (and a purpose to evade) the reporting requirements but not specific knowledge of the illegality of structuring.[9]

Before 1986, the reporting requirements included no provision explicitly prohibiting the structuring of transactions to evade the reporting requirements. The Government attempted to combat purposeful evasion of the reporting requirements through 18 U. S. C. § 1001, which applies to anyone who "knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact" within the jurisdiction of a federal agency, and 18 U. S. C. § 2(b), which applies to anyone who "willfully causes an act to be done which if directly performed by him or another would be an offense" under federal law. Some Courts of Appeals upheld application of those criminal statutes where a report would have been filed but for the defendant's purposeful structuring. See, e. g., United States v. Tobon-Builes, 706 F. 2d 1092, 1096–1101 (CA11 1983); United States v. Heyman, 794 F. 2d 788, 790–793 (CA2), cert. denied, 479 U. S. 989 (1986). As the leading case explained, a defendant's willfulness was established if he "knew about the currency reporting requirements and . . . purposely sought to prevent the financial institutions from filing required reports . . . by structuring his transactions as multiple smaller transactions under $10,000." Tobon-Builes, 706 F. 2d, at 1101.

Other courts rejected imposition of criminal liability for structuring under §§ 1001 and 2(b), concluding either that the

---

[9] Because the statutory language unambiguously imposes no requirement of knowledge of the illegality of structuring, I would not apply the rule of lenity. Moreover, I am not persuaded that that rule should be applied to defeat a congressional purpose that is as clear as that evidenced here. See Liparota, 471 U. S., at 427; United States v. Bramblett, 348 U. S. 503, 509–510 (1955).

law did not impose a duty not to structure or that criminal liability was confined to limited forms of structuring. See, *e. g., United States* v. *Varbel,* 780 F. 2d 758, 760–763 (CA9 1986); *United States* v. *Denemark,* 779 F. 2d 1559, 1561–1564 (CA11 1986); *United States* v. *Anzalone,* 766 F. 2d 676, 679–683 (CA1 1985).

Congress enacted the antistructuring provision in 1986 "to fill a loophole in the Bank Secrecy Act caused by" the latter three decisions, which "refused to apply the sanctions of [the Act] to transactions 'structured' to evade the act's $10,000 cash reporting requirement." S. Rep. No. 99–433, p. 7 (1986). As explained by the Report of the Senate Judiciary Committee:

> "[The antistructuring provision] would codify *Tobon-Builes* and like cases and would negate the effect of *Anzalone, Varbel* and *Denemark.* It would expressly subject to potential liability a person who causes or attempts to cause a financial institution to fail to file a required report or who causes a financial institution to file a required report that contains material omissions or misstatements of fact. In addition, the proposed amendment would create the offense of structuring a transaction to evade the reporting requirements, without regard to whether an individual transaction is, itself, reportable under the Bank Secrecy Act." *Id.,* at 22.

See also H. R. Rep. No. 99–746, pp. 18–19, and n. 1 (1986). Congress' stated purpose to "codify *Tobon-Builes*" reveals its intent to incorporate *Tobon-Builes'* standard for a willful violation, which required knowledge of the reporting requirements and a purpose to evade them. Nothing in *Tobon-Builes* suggests that knowledge of the illegality of one's conduct is required.[10]

---

[10] Contrary to the majority's suggestion, *ante,* at 147–148, n. 17, Congress did sanction *Tobon-Builes'* scienter standard. In that case, which Congress intended to "codify," the Eleventh Circuit clearly addressed the

The Senate Report proceeds to explain the intent required under the antistructuring provision:

> "For example, a person who converts $18,000 in currency to cashier's checks by purchasing two $9,000 cashier's checks at two different banks or on two different days

level of knowledge required for a willful violation. See *United States* v. *Tobon-Builes*, 706 F. 2d 1092, 1101 (CA11 1983). Moreover, Congress was aware of the standard that the court had adopted, explicitly characterizing *Tobon-Builes* as imposing criminal liability upon individuals who structure transactions "to evade the reporting requirements." S. Rep. No. 99–433, at 21.

The majority misreads the Senate Report as stating that § 5324 creates the structuring offense "*'[i]n addition'* to codifying *Tobon-Builes*." *Ante,* at 148, n. 17. The phrase "in addition" plainly refers to the previous sentence in the Report, which states that § 5324 "would expressly subject to potential liability a person who causes or attempts to cause a financial institution to fail to file a required report or who causes a financial institution to file a required report that contains material omissions or misstatements of fact." S. Rep. No. 99–433, at 22. The "codification" of *Tobon-Builes* encompasses both sentences, and thus all three subsections of the original § 5324. In any event, there is no doubt that the Report's reference to "codifying *Tobon-Builes*" is a reference to the creation of the antistructuring offense, particularly given that *Tobon-Builes* expressly imposed criminal liability for "structuring" transactions. 706 F. 2d, at 1101.

Even more direct evidence of Congress' intent to incorporate the *Tobon-Builes* scienter standard is found in the response to a question from Senator D'Amato, the Senate sponsor of the antistructuring provision. He asked Deputy Assistant Attorney General Knapp and Assistant United States Attorney Sun: "Assuming that [the antistructuring] provision had been on the books, could you have demonstrated a willful violation in the *Anzalone, Varbel* and *Denemark* cases?" The written response stated: "Assuming that the terms of [the antistructuring provision] were in effect at the time of the conduct described in *Anzalone, Varbel,* and *Denemark,* the result would, or should have been markedly different. Statements from defendants in those cases indicated that the structuring conduct was purposely undertaken to evade the reporting requirements of Title 31. As this is expressly what is prohibited under [the antistructuring provision], a willful violation . . . would have been demonstrated." Hearing on S. 571 and S. 2306 before the Senate Committee on Banking, Housing, and Urban Affairs, 99th Cong., 2d Sess., at 141–142.

*with the specific intent that the participating bank or banks not be required to file Currency Transaction Reports for those transactions,* would be subject to potential civil and criminal liability. A person conducting the same transactions for any other reasons or a person splitting up an amount of currency that would not be reportable if the full amount were involved in a single transaction (for example, splitting $2,000 in currency into four transactions of $500 each), would not be subject to liability under the proposed amendment." S. Rep. No. 99–433, at 22 (emphasis added).

The Committee's specification of the requisite intent as only the intent to prevent a bank from filing reports confirms that Congress did not contemplate a departure from the general rule that knowledge of illegality is not an essential element of a criminal offense.

A recent amendment to § 5324 further supports the interpretation of the court below. In 1992, Congress enacted the Annunzio-Wylie Anti-Money Laundering Act, creating a parallel antistructuring provision for the reporting requirements under 31 U. S. C. § 5316, which governs international monetary transportation. See Pub. L. 102–550, Tit. XV, § 1525(a), 106 Stat. 4064.[11] Like the provision at issue here, the new provision prohibits structuring "for the purpose of evading the reporting requirements" (in that case, the requirements of § 5316). At the time Congress amended the statute, every Court of Appeals to consider the issue had held that a willful violation of the antistructuring provision requires knowledge of the bank's reporting requirements and an intent to evade them; none had held that knowledge of the illegality of structuring was required. See n. 3, *supra.*

---

[11] The new law moved the antistructuring provision at issue here into a new subsection (a) of § 5324 and created subsection (b) for the new antistructuring provision.

The House Report accompanying an earlier bill containing the pertinent provision explained:

> "Under the new provision, codified as subsection (b) of section 5324, it would be illegal to structure the importation or exportation of monetary instruments with the intent to evade the . . . reporting requirement. As is the case presently for structuring cases involving currency transaction reports, the government would have to prove that the defendant knew of the . . . reporting requirement, *but would not have to prove that the defendant knew that structuring itself had been made illegal. United States* v. *Hoyland,* 903 F. 2d 1288 (9th Cir. 1990)." H. R. Rep. No. 102–28, pt. 1, p. 45 (1991) (emphasis added).[12]

The 1992 amendment's replication of the original antistructuring provision's language strongly suggests that Congress intended to preserve the then-uniform interpretation of the scienter requirement of § 5324. See *Keene Corp.* v. *United States,* 508 U. S. 200, 212–213 (1993). At the very least, then, today's decision poses a dilemma for any attempt to reconcile the two parallel antistructuring provisions now codified in § 5324: Courts must either ignore clear evidence of legislative intent as to the newly added antistructuring provision or interpret its identical language differently from the antistructuring provision at issue in this case.

Finally, it cannot be ignored that the majority's interpretation of § 5324 as a practical matter largely nullifies the effect of that provision. In codifying the currency transaction reporting requirements in 1970, "Congress recognized the importance of reports of large and unusual currency transactions in ferreting out criminal activity." *California Bankers Assn.* v. *Shultz,* 416 U. S. 21, 38 (1974). Congress enacted the antistructuring law to close what it perceived as

---

[12] The Court of Appeals for the Ninth Circuit relied on *Hoyland* in affirming the conviction in this case.

a major loophole in the federal reporting scheme due to easy circumvention.[13]   Because requiring proof of actual knowledge of illegality will make prosecution for structuring difficult or impossible in most cases,[14] the Court's decision reopens the loophole that Congress tried to close.

## III

The petitioner in this case was informed by casino officials that a transaction involving more than $10,000 in cash must be reported, was informed by the various banks he visited that banks are required to report cash transactions in excess of $10,000, and then purchased $76,000 in cashier's checks, each for less than $10,000 and each from a different bank. Petitioner Ratzlaf, obviously not a person of limited intelligence, was anything but uncomprehending as he traveled from bank to bank converting his bag of cash to cashier's checks in $9,500 bundles.   I am convinced that his actions constituted a "willful" violation of the antistructuring provision embodied in 31 U. S. C. § 5324.   As a result of today's decision, Waldemar Ratzlaf—to use an old phrase—will be "laughing all the way to the bank."

The majority's interpretation of the antistructuring provision is at odds with the statutory text, the intent of Congress, and the fundamental principle that knowledge of illegality is not required for a criminal act.   Now Congress must try again to fill a hole it rightly felt it had filled before. I dissent.

---

[13] See, *e. g.*, S. Rep. No. 99–433, at 2–3, 7.

[14] See Welling, Smurfs, Money Laundering, and the Federal Criminal Law: The Crime of Structuring Transactions, 41 Fla. L. Rev. 287, 320 (1989).