**PUEBLO OF SANTA ANA,**
**Plaintiff–Appellant**

v.

**UNITED STATES, Defendant–Appellee.**

No. 99–5105.

United States Court of Appeals,
Federal Circuit.

June 1, 2000.

Richard W. Hughes, Rothstein, Donatelli, Hughes, Dahlstrom, Cron & Schoenburg, LLP, of Sante Fe, New Mexico, argued for plaintiff-appellant.

Thomas L. Halkowski, Attorney, Environment & Natural Resources Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief was Lois J. Schiffer, Assistant Attorney General.

Before CLEVENGER, BRYSON, and LINN, Circuit Judges.

CLEVENGER, Circuit Judge.

The Pueblo of Santa Ana appeals the judgment of the United States Court of Federal Claims, holding that the United States did not violate the Fifth Amendment to the United States Constitution or

breach its trust relationship by appropriating minerals, such as rock and gravel, from land near the Jemez Canyon Dam and Reservoir in New Mexico. *See Pueblo of Santa Ana v. United States*, No. 92–624L, slip op. at 7–8 (Fed.Cl.1997). Because the land grant to the Pueblo of Santa Ana did not reserve in the United States the right to use the minerals taken, we reverse and remand.

## I

For thousands of years, members of the Pueblo of Santa Ana ("the Pueblo") have resided in what is now known as Sandoval County, New Mexico. The Pueblo's history has been marked by continuing struggles—variously under the dominion of the Kingdom of Spain, the Republic of Mexico, and, lately, the United States—to gain and protect rights to land occupied and worked by their members. Now a federally-recognized Indian tribe, this latest chapter of the Pueblo's saga finds them seeking to protect mineral rights to lands granted to them by an Act of Congress in 1978.

The instant controversy has its genesis in the Flood Control Act of 1948, Pub.L. No. 80–858, 62 Stat. 1171, which authorized the construction of the Jemez Canyon Dam and Reservoir ("the Jemez Dam") on the Rio Jemez, a tributary of the Rio Grande that begins in the Jemez Mountains just west of the city of Santa Fe, and flows in a southeasterly direction across the lands of the Pueblo, joining the Rio Grande near the town of Bernaillo approximately 20 miles north of Albuquerque, New Mexico. The Jemez Dam was constructed in the early 1950s.

In the early 1980s, the Army Corps of Engineers initiated a "Dam Safety Assurance Program," which provided that the Corps would review the safety of all completed Corps dam projects, including the Jemez Dam. The resulting Corps study revised the probable maximum flood figures for the Rio Jemez, and thus resulted in a recommendation that the Jemez Dam be modified and its spillway reconfigured accordingly. In 1986, the Corps proceeded with this modification, contracting with a private construction firm to raise the crest of the dam and significantly modify the spillway. The work was completed in February 1987.

In the course of the modification project, the contractor, at the direction of the Corps, utilized substantial amounts of rock and fill material taken from Pueblo lands surrounding the Jemez Dam area. The parties agree that these materials have commercial value and that the Corps would have had to purchase such materials from private suppliers and transport them to the work site if they had not been taken from nearby Pueblo lands. The Pueblo unsuccessfully demanded compensation from the United States for the use of these materials. In 1992, the Pueblo filed this lawsuit in the United States Claims Court (now known as the United States Court of Federal Claims), seeking just compensation from the United States under the Fifth Amendment.

After years of settlement discussions and discovery, the parties filed cross-motions for summary judgment in 1996. Following oral argument, the Court of Federal Claims granted partial summary judgment in favor of the United States on the issue of liability, reasoning that the United States was free to use minerals taken from that portion of Pueblo lands (about 2,240 acres) subject to a 1952 public land order, but that minerals taken from lands not subject to the 1952 public land order must be paid for by the government. *See Pueblo of Santa Ana v. United States*, No. 92–624L, slip op. at 7–8 (Fed.Cl.1997). The compensation issue was later settled and dismissed by stipulation. *See Pueblo of Santa Ana v. United States*, No. 92–624L (order filed April 15, 1999). This appeal followed, vesting this court with jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (Supp.1999).

## II

The Pueblo's primary argument on appeal is that the appropriation of minerals for the 1986–87 Jemez Dam modifications

is a compensable taking under the Fifth Amendment to the United States Constitution. The United States disclaims liability, arguing that the grant of the land to the Pueblo did not alter the United States' right to use minerals taken from these lands for dam-related purposes. We must decide which of these views is correct.

The Court of Federal Claims granted summary judgment to the United States on this issue, a question that we review without deference. *See Foley Co. v. United States,* 11 F.3d 1032, 1034 (Fed.Cir. 1993); *Confederated Tribes v. United States,* 964 F.2d 1102, 1107 (Fed.Cir.1992).

### A

The history of the property rights involved in this case is long and checkered. The Pueblo has occupied and controlled the land in question since before the 17th century. The lands were used by the Pueblo for economic and religious purposes until 1937, when the regional grazing committee for that area of New Mexico asserted jurisdiction over the lands pursuant to the Taylor Grazing Act of 1934 on the assumption that they were part of the public domain. The Bureau of Indian Affairs, acquiescing in this misdesignation, sought a grazing permit for the Pueblo. This permit was initially denied on the grounds that the land was needed for "qualified native applicants"—who turned out to be local non-Indian ranchers. By the mid–1950s, however, the lands involved in this case were permitted to the Pueblo, though they remained formally the public domain property of the United States. *See generally* H.R. Rep. No. 95–1219, at 6–7 (1978) (explaining history of the land involved).

On November 14, 1952, as the Army Corps of Engineers began to make plans to build the Jemez Dam, the Secretary of the Interior issued Public Land Order Number 873 ("PLO 873"), stating that about 2,240 acres of the land was "hereby withdrawn from all forms of appropriation under the public-land laws, including the mining and mineral-leasing laws, and reserved for use in connection with the con-struction of the Jemez Canyon Dam and Reservoir Project, New Mexico." 17 Fed. Reg. 10636–37 (1952). The dam was built thereafter.

In 1978, title to the lands changed hands. In Public Law No. 95–498 ("the 1978 Act"), Congress sought to rectify the injustice done by the erroneous designation of the Pueblo's lands as "public domain." In the 1978 Act, Congress declared that the lands involved in this case would be held in trust by the United States for the benefit of the Pueblo. *See* Pub.L. No. 95–498, Preamble (1978). Section 3 of the 1978 Act considers minerals, stating that "[a]ll of the right, title, and interest of the United States in all minerals, including gas and oil, underlying the lands ... are hereby declared to be held by the United States in trust for the benefit and use of the Pueblo of Santa Ana." *See* Pub.L. No. 95–498, § 3. However, section 1(b) of the 1978 Act provides that the lands at issue in this case (the approximately 2,240 acres identified in PLO 873) "shall continue to be subject to Public Land Order 873 ... until such lands, or any portion thereof, are determined by the Secretary of the Army to be no longer needed for the purposes for which the lands were reserved under such order." Thus, Congress stated that while the land involved—and its minerals—was to be held in trust for the Pueblo, the land in question remained "subject to" the terms of PLO 873.

### B

The parties agree that whether the United States must compensate the Pueblo for the minerals used in the Jemez Dam reconstruction turns on the effect of PLO 873 on the 1978 land grant to the Pueblo. The question is whether the express grant of mineral rights to the Pueblo to all the lands conveyed under the 1978 Act, including the PLO 873 lands, is undermined by the fact that the 1978 Act also left the lands in question "subject to" PLO 873. This is an issue of statutory construction, a

legal matter that we review de novo. *See, e.g., I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). The United States argues that by explicitly stating that PLO 873 remained in effect, Congress intended to reserve the use of the minerals in the land covered by PLO 873 for dam-related purposes.

We must begin by noting that the literal language of PLO 873, when combined with the 1978 Act, makes little sense. PLO 873 purports to "withdraw" the 2,240 acres at issue in this case from "appropriation under the public-land laws." 17 Fed.Reg. 10636 (1952). Yet the 1978 Act makes clear that the 2,240 acres covered by PLO 873 are no longer subject to the public land laws, but are instead to be held in trust for the Pueblo. Thus, Congress cannot have meant that the prohibition against appropriation under the public land laws was to continue: the entire purpose of the 1978 Act was to remove the land from the public domain (*i.e.,* under the purview of the public land laws) and convey them to the Pueblo, thus obviating the need for the literal language of PLO 873 to remain in effect.

■ Nonetheless, Congress must have meant section 1(b) of the 1978 Act to mean *something*—by including the reference to PLO 873, Congress clearly thought that the continuing existence of the Jemez Dam called for some limitation of the Pueblo's property rights over the 2,240 acres. The question is whether that "something" includes the unrestricted right of the Corps to use minerals on and under the land for dam-related purposes. We hold that it does not.

First, Section 3 of the 1978 Act considers the question of mineral rights. That section grants "all minerals ... underlying the lands hereby declared to be held in trust for the Pueblo" to the Pueblo. There is no mention of PLO 873 or any other reservation of mineral rights. Section 3 thus refers to the grant of land contained in section 1, which indisputably includes the 2,240 acres covered by PLO 873. The separation of mineral rights (in section 3)

from the description of "lands" (in section 1), is evidence that Congress understood that the reference to PLO 873 in section 1 was not to correspondingly limit the mineral rights granted in section 3. *See, e.g., I.N.S. v. Cardoza–Fonseca,* 480 U.S. at 432, 107 S.Ct. 1207 (" 'Where Congress includes particular language in one section of a statute but omits it in another section of the same act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' ") (Quoting *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)).

Second, we note that the original draft of the bill that became the 1978 Act specifically excluded the 2,240 acres pertaining to the PLO 873 from the property grant to the Pueblo. The bill was amended to effect the transfer of the 2,240 acres to the Pueblo. *See* H.R. Rep. No. 95–1219, at 9 (1978) ("The committee adopted an amendment.... Section 1 is rewritten to include an additional 2240 acres of land withdrawn for use by the Corps of Engineers for the [Jemez Dam] project. After transfer, however, these lands will remain subject to the provisions of Public Land Order 873."). This is further evidence that Congress intended the continuing scope of PLO 873 to be less than an outright reservation of property rights.

Third, we note that PLO 873 itself does not grant the government the rights to the minerals underlying the 2,240 acres. *See* 17 Fed.Reg. 10636 (1952). The language of PLO 873 simply withdraws the lands from appropriation by third parties for "use in connection with the construction of the [Jemez Dam]." *Id.* Indeed, when PLO 873 was issued, there would have been no need to "grant" the United States mineral rights in the 2,240 acres—the land at that time was considered the property of the United States. Accordingly, PLO 873 simply provides notice to third parties that the government will not allow appropriation of the land, because of use of the property for the dam construction. The fact that PLO

873 describes the "use" to which the United States would put its land—to construct the Jemez Dam—does not convince us that the description of the then-contemplated use conveyed an ongoing right to appropriate minerals from the subject lands after Congress expressly conveyed those mineral rights to the Pueblo. If Congress had intended to effect such a statutory inconsistency—by expressly conveying all mineral rights to the Pueblo and then excluding mineral rights to the PLO 873 land—it would have included far more than the notation that some of the land was "subject to" PLO 873, the terms of which do not convey mineral rights to the United States. Under these circumstances, we cannot find clear congressional intent to keep mineral rights in the PLO 873 land for itself. *See Ratzlaf v. United States,* 510 U.S. 135, 143, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (courts avoid reading portions of statutes inconsistently); *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (same); *Vectra Fitness, Inc. v. TNWK Corp.,* 162 F.3d 1379, 1384–85 (Fed.Cir.1998) (same).

■ Finally, we note that any lingering doubts as to the statutory construction of these provisions must be resolved to the benefit of the Pueblo. *See, e.g., DeCoteau v. District County Court,* 420 U.S. 425, 444, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975) (ambiguous or uncertain statutory provisions in laws intended to benefit Native Americans construed in their favor).

Because the 1978 Act left the lands in question subject to PLO 873, it is fair to assume that some federal interest in those lands was retained by the United States. The Pueblo suggests that those rights are in the nature of easements of access and maintenance in connection with service of the dam project. This view finds support in the 1986 amendments to the 1978 Act, which clarified that the United States retained an "easement of access for the purposes of operating and maintaining the [Jemez Dam]." Pub.L. No. 99–575, § 2(c) (1986). For purposes of this appeal, how-

ever, we need decide only whether the retained federal interest includes mineral rights to the land in question. For the reasons stated above, we answer that question in the negative. We have no case or controversy before us as to what other rights may lie in the United States for the lands subject to PLO 873. In any event, the Corps' appropriation of minerals demands just compensation to the Pueblo. *See* U.S. Const., amend. V.

### III

The 1978 Act declared the 2,240 acres of land in question to be held in trust for the benefit of the Pueblo, including all mineral rights. That Act's reservation of certain rights to the United States under PLO 873 did not retain in the United States the right to use minerals from the land in connection with the Jemez Dam reconstruction project. The decision of the Court of Federal Claims to the contrary is therefore reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

### COSTS

No costs.

### REVERSED AND REMANDED