**UNITED STATES of America, Appellee,**

v.

**Jose V. ANDRADE, Jr., Defendant, Appellant.**

**No. 96–2309.**

United States Court of Appeals, First Circuit.

Heard Nov. 4, 1997.

Decided Feb. 3, 1998.

Rehearing Denied March 9, 1998.

Miriam Conrad, Federal Defender Office, for appellant.

James F. Lang, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief for the United States.

Before BOUDIN, Circuit Judge, COFFIN, Senior Circuit Judge, and DOWD,* Senior District Judge.

* Of the Northern District of Ohio, sitting by designation.

BOUDIN, Circuit Judge.

Jose V. Andrade, Jr., appeals from his conviction for conspiracy to engage without a license in the business of dealing in firearms, 18 U.S.C. §§ 371, 922(a)(1)(A) (1994), and for transporting firearms without a license into his state of residence, *id.* § 922(a)(3). The facts pertaining to the issues raised on appeal are largely undisputed. As the sufficiency of the evidence is not an issue, we abbreviate the facts.

Andrade, a native of Boston, attended Jackson State University in Jackson, Mississippi, during 1993 and 1994. At the time, the authorities suspected Andrade of moving guns illegally from Mississippi to Massachusetts. On December 16, 1994, Andrade—then in Boston for Christmas vacation—was arrested and questioned in circumstances described below. His family apartment and two others occupied by cousins were searched on the same day based on search warrants or consent. Andrade was released the same day, questioned at home on December 19, and rearrested in March 1995.

On April 26, 1995, Andrade was indicted for conspiracy to engage in gun dealings, together with Christopher Todd and Terrance Smith, who were alleged to have purchased guns for Andrade in Mississippi; as residents, it was easier for them to purchase guns than for Andrade to do so. In January 1996, the grand jury issued a superseding indictment against Andrade, adding the second count (transporting firearms into Massachusetts). By that time, Todd had pled guilty, and charges against Smith had been dismissed.

On May 8, 1996, the district court issued a decision refusing to suppress statements that Andrade had made to the authorities on December 16 and December 19 and refusing to suppress the results of the searches of December 16. *United States v. Andrade,* 925 F.Supp. 71, 81 (D.Mass.1996). Andrade was tried before a jury in May 1996, the trial lasting about two weeks. The most damaging testimony was given by Todd and Smith.

Both men gave detailed accounts of Andrade's requests to them in 1993 and 1994 to

buy handguns and his statements that he planned to take them to Boston to sell. Todd and Smith each described multiple occasions on which, in Andrade's company, they purchased handguns for Andrade in different gun shops and pawnshops, Andrade selecting the weapons and taking them afterwards from Todd or Smith. Certain of the guns were later recovered by the police in Boston.

Two pawnshop employees, from different pawnshops, identified Andrade as an individual who accompanied Todd on specific occasions. Michael Spinola, Andrade's first cousin and friend, admitted saying that Andrade had told Spinola that he was bringing guns from Mississippi to Boston to sell and that Spinola had seen some of the weapons; but although Spinola had given detailed testimony to this effect to the grand jury, at trial he described much of it as lies. There is also testimony from a former friend of Andrade, who said that in December 1994 after the search warrants were executed, Andrade had asked the friend whether he would store a suitcase of guns for Andrade.

Andrade sought to impeach government witnesses. Although he did not testify himself, Andrade offered testimony of Manuel Correia, who had been his roommate at the University in Mississippi. Correia said that he had driven from Jackson to Boston with Andrade three times, had seen or helped Andrade pack, and had never seen any guns around. Andrade's own statements, and some of the evidence seized from the apartment searches, were introduced by the government.

The jury retired to deliberate on May 29, 1996. The next day it asked the court to answer a question about the substantive count (transporting guns into Massachusetts); the question and court's reply are at issue on appeal and are discussed below. On May 31, Andrade was convicted on both counts and later sentenced to 46 months in prison.

Andrade's first claim of error is that the district court admitted statements that Andrade had made during his December 16 interrogation at the police station. After his arrest, Andrade was taken to an office in a Roxbury police substation and handcuffed to a chair. There, Bureau of Alcohol, Tobacco and Firearms agent Daniel Campbell read Andrade the *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966), and asked him if he understood his rights; Andrade said that he did. A state police officer, Francis Matthews, was also present.

Campbell told Andrade that he was under investigation for gun shipments, and that the police had search warrants for two premises connected with Andrade. Andrade said that he had bought guns in Mississippi but that he was a collector and not a dealer. Andrade also identified a third apartment where he had stayed. Campbell then went to execute the search warrants and obtained permission from the owner to search the third apartment.

After Campbell left, an INS agent sought to question Andrade about his immigration status. Andrade refused, so Matthews told the agent to leave. A Boston police officer then entered and, hearing Andrade tell Matthews that he was not a firearms dealer, accused Andrade of lying; there was an angry reply from Andrade, and Matthews told the detective to leave. After some further discussion between them, Matthews said to Andrade that he would not keep bothering Andrade if he didn't want to talk, and Matthews then spent about two hours on paperwork while Andrade slept in the chair.

At some point during the searches, police apparently suggested to Andrade's sister that she talk to him by telephone; she did so, crying and pleading with Andrade to talk to the police. When Campbell returned to the substation, Andrade had been held for about four hours. Campbell woke him and asked him if he remembered the rights that had been read to him earlier. Andrade said that he did.

At this point, Campbell said that he knew that Todd and Smith had purchased guns for Andrade in Mississippi. Andrade replied that he knew Todd and Smith and was present when they purchased guns. Andrade admitted that he obtained guns from Todd and Smith but said that he had sold them in Mississippi to three men from Houston, al-

though he also admitted having given a couple of guns to two men in Boston.

Andrade was released after offering to cooperate with the police in retrieving weapons that the police thought were still at large in Boston. Seeking this cooperation, Campbell and a Boston Police detective visited Andrade at home on December 19, where Andrade said that three men from Houston would soon be arriving in Boston with weapons and drugs. Andrade offered to introduce the men to Campbell. Andrade's statements on both days were offered in evidence at trial.

In this court, Andrade does not claim that the statements he made were involuntary. Instead, he says that by repeated questioning police failed to honor his right to remain silent under the *Miranda* doctrine, *see Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 326–27, 46 L.Ed.2d 313 (1975), and that when Campbell resumed questioning after completing the apartment searches, there was no adequate waiver when Andrade made the statements in the second interrogation. The district court held otherwise, and we agree.

■■■ *Miranda* requires that the police warn a suspect in custody of his right to counsel and his right to remain silent. If the police have failed to give the warnings and obtain a waiver of rights, the statements are excluded, even if otherwise voluntary. Where the suspect asserts that he wants to consult with counsel, questioning must cease until counsel is provided. *See Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). But when a defendant invokes his right to remain silent, *Mosley* makes clear that the police are not automatically forbidden from later resuming interrogation.

■■ Andrade's initial statements to Campbell were voluntarily made after full warnings. Andrade's later rebuff of the INS agent and police detective were refusals to speak to them but were not couched as a refusal to talk with anyone. When Matthews ended his own questioning, it appears that Andrade no longer wanted to talk with Mat-

thews, but neither did Andrade rule out the possibility of talking later.

We see nothing wrong with Campbell's decision to resume questioning of Andrade after the searches. A reasonable interval separated the two periods of questioning, *see Mosley*, 423 U.S. at 106, 96 S.Ct. at 327–28, and there was no repeated attempt to reverse a refusal to talk through undue pressure. The circumstances were quite different in *United States v. Barone*, 968 F.2d 1378 (1st Cir.1992), where the defendant resisted questioning, was held for over 24 hours, was interrogated four times before he began to discuss the crime, and was twice intimidated by suggestions that he "would be in substantial [physical] danger if he returned to Boston without cooperating." *Id.* at 1385; *see also id.* at 1386.

■■ Whether Andrade's later statements reflected a waiver of his right to remain silent is a closer issue. The problem is that the Supreme Court has said, almost in the same breath, that "mere silence is not enough" for a waiver, but that this "does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that the defendant has waived his rights." *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). The waiver issue, it appears, must be decided on the facts. *See id.* at 374–75, 99 S.Ct. at 1758.

Here, we have no reason to doubt that Andrade knew that he had a right to remain silent; at the outset of the second round, Campbell reminded him of the earlier warnings, and Andrade confirmed that he remembered. As for the intervening events, Matthews' dismissal of the INS agent and police detective, when Andrade demurred, fairly conveyed the message that Andrade was in charge of the decision whether and to whom he would speak. By ending the initial round of questioning, Matthews himself reinforced this message.

Andrade's subsequent admissions to Campbell were not confessions wrested from a reluctant detainee. Andrade's statements were partly consistent with Andrade's cover story (selling the weapons to three men from

Houston) and partly an attempt to explain away the presence of some of the weapons in Boston. In short, Andrade had a rational reason for *choosing* not to remain silent. While a written waiver would have helped the government, it is not a mechanical requirement.[1]

█ Andrade's next claim is that the trial court's instructions on the first count—conspiracy to deal in firearms without a license—set too low a scienter requirement. 18 U.S.C. § 924(a)(1)(D) provides that a number of weapons offenses, including the offense of dealing without a license, require that the proscribed conduct be willfully undertaken. Andrade's counsel asked the court to instruct the jury that this in turn required proof beyond a reasonable doubt that "the defendant knew that Section 922(a)(1)(A) requires one who engages in the business of dealing in firearms to obtain a dealer's license from the Secretary of the Treasury."

The district court refused to give this instruction. Instead, it told the jury that one acts willfully when he intentionally commits acts proscribed by law "with knowledge that his conduct is unlawful." The court said that knowledge of illegality had to be proved beyond a reasonable doubt. But it also instructed that the government did not have to prove that the defendant knew of the specific statute that he was charged with violating or that he intended to violate that particular statute.

If case law from other circuits is put to one side, the issue appears easy. The term "willful" is used in various ways, but the standard definitions normally emphasize that a defendant acted "with knowledge that [his] conduct is unlawful," 1 L. Sand, J. Siffert, W. Loughlin & S. Reiss, *Modern Federal Jury Instructions* ¶ 3A.01, at 3A–18 (1997). Willfulness is often required where a statute outlaws conduct commonly thought to be lawful. In some measure, the willfulness requirement reverses the usual rubric that ignorance of the law is no defense. Just how much ignorance may be needed is a different matter.

Nothing in the traditional willfulness instruction, nor in its underlying purpose, requires that the defendant possess specific knowledge of the statutory provision that makes his conduct unlawful. To impose such a requirement of detailed knowledge of the firearms statutes (to which few judges could pretend) would make an enforcement of the gun dealer laws very difficult. And the requirement goes well beyond what is needed to screen out an innocent who honestly thought that his conduct was lawful.

Our view accords with the purpose of Congress in adopting the willfulness requirement in the Firearms Owners' Protection Act of 1986, Pub.L. 99–308, 100 Stat. 449. Congress's concern was that, because of the nature of the conduct and technicality of the statute, some offenses might be committed by individuals who were unaware that their conduct had been made criminal.[2] Nothing indicates that Congress was concerned with protecting individuals who knew that their conduct was unlawful but might not be able to cite chapter and verse as to which precise provision made it so.

The proponents of the willfulness requirement, to the extent that we can discover their comments, said nothing to suggest that the term was intended to go beyond its ordinary meaning, that is, awareness that one's conduct is unlawful. The only suggestions that the statute might require knowledge of the "details" of the law came from opponents of the amendment; given the incentive to exaggerate, such remarks normally get little weight. *NLRB v. Fruit & Vegetable Packers*

---

1. *Compare United States v. Christian*, 571 F.2d 64, 66, 69 (1st Cir.1978) (no waiver where a defendant's signature on an FBI waiver form showed that he had admitted being advised of his rights, but conspicuously omitted his signature on the line provided for a waiver of those rights).

2. The willfulness requirement applies to some gun crimes and not others, and the dividing line is crudely drawn between actions that anyone might expect to be unlawful, *see, e.g.,* 18 U.S.C. §§ 922(v), 924(a)(1)(B) (semiautomatic assault weapon crimes), and actions that might not always appear unlawful, *see, e.g., id.* §§ 922(e), 924(a)(1)(D) (shipping a firearm in interstate commerce without written notice to the common carrier).

& *Warehousemen, Local 760,* 377 U.S. 58, 66, 84 S.Ct. 1063, 1068, 12 L.Ed.2d 129 (1964).[3]

The Second Circuit has squarely ruled that the government need only prove that the defendant knew that his conduct was illegal. *United States v. Collins,* 957 F.2d 72, 76–77, *cert. denied,* 504 U.S. 944, 112 S.Ct. 2285, 119 L.Ed.2d 210 (1992). *Accord United States v. Allah,* 130 F.3d 33, 38–41 (2d Cir.1997); *United States v. Bryan,* 122 F.3d 90, 91 (2d Cir.), *cert. granted,* —— U.S. ——, 118 S.Ct. 622, 139 L.Ed.2d 507 (1997). The Seventh Circuit's decision in *United States v. Obiechie,* 38 F.3d 309 (1994), largely points toward a standard of general knowledge of illegality, although one sentence suggests that knowledge of the licensing requirement may be required. *See id.* at 316.

Several other circuits—including the Third and Eighth—say generally that the defendant must have "knowledge of the law," *e.g., United States v. Hayden,* 64 F.3d 126, 130 (3d Cir.1995) ("the defendant must have acted with knowledge that his conduct was unlawful"); *United States v. Hern,* 926 F.2d 764, 767 (8th Cir.1991) (" 'willful' means an intentional violation of a know legal duty"). But this language could be read either to support Andrade or the Second Circuit. And the matter is further confused because, in purporting to disagree with the Second Circuit, several such decisions misunderstand its position.[4]

Admittedly, two other circuits say that conviction requires proof that the defendant was aware of the licensing requirement itself, but we do not find these cases persuasive. *See United States v. Rodriguez,* 132 F.3d 208, 212 (5th Cir.1997); *United States v. Sanchez–Corcino,* 85 F.3d 549, 553–54 (11th Cir.1996). Even decisions like *Rodriguez,*

purporting to require specific awareness of the statute, dilute the requirement by inferring specific knowledge from circumstantial evidence. *See Rodriguez,* 132 F.3d at 212

Such evidence is likely to be good proof that the defendant knew that his conduct was unlawful but very thin evidence that the defendant knew what statute made it so. *See Rodriguez,* 132 F.3d at 213 ("counter-surveillance operations," "unease about the sale," and "experience at 'The Bunker' and with firearms" gave defendant a "background from which she should have been familiar with the firearms laws"). *See also Obiechie,* 38 F.3d at 316 ("An inference of knowledge could be drawn from the fact that [defendant] had listed 'gift' as his reason for purchasing the [guns] . . . after having indicated that the first two purchases were for retail sale."). Since juries are being allowed to convict on the basis of such evidence, nothing is gained by instructing the jury with language suggesting that the standard is higher than it actually is.

Nor is Andrade's position supported, as he claims, by *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). *Ratzlaf* held that a currency structuring violation required "knowledge of illegality [as] an element" to show willfulness, *Bates v. United States,* —— U.S. ——, —— n. 6, 118 S.Ct. 285, 290 n. 6, 139 L.Ed.2d 215 (1997), which is just what the district court told the jury here. In *Ratzlaf,* knowledge of a specific statute (or something close to it) was *also* required—not because of the willfulness requirement but because the statute itself required a "purpose of evading the reporting requirements" of 31 U.S.C. § 5313(a). *See* 31 U.S.C. § 5324. This additional wrinkle is not part of the present case.

---

3. *Compare* 132 Cong. Rec. 6876 (1986) (statement of Rep. Hughes) (opponent's comments that the new statute would require the defendant to know "what the law is, every detail of the law. . . . [I]t would be a prosecutor's nightmare"), *with id.* at 6861 (statement of Rep. Boehlert) (supporter's comment that the statute rejected mere knowledge of conduct in favor of "some sort of criminal intent"). The scattered and extensive legislative history is recounted in D. Hardy, The Firearms Owners' Protection Act: A Historical and Legal Perspective, 17 *Cumb. L.Rev.* 585, 604–07, 645–53 (1987).

4. The Third Circuit, for example, ascribes to the Second Circuit the view that the government need prove only that the defendant knew what he was doing. *Hayden,* 64 F.3d at 130 n. 6. The Second Circuit has, to our knowledge, never expressed this view. *See Collins,* 957 F.2d at 77 (the evidence "demonstrate[d] that Collins understood that his firearms sales violated the law").

In short, after surveying the cases, we feel on solid ground in joining the Second Circuit position that it is enough that the defendant be aware that his conduct is unlawful. Such knowledge, needless to say, depends upon the circumstances. In our case, the scale of Andrade's gun smuggling activity, his denials of gun dealing in the police station, and other evidence that he sought to hide the weapons are powerful indications of his awareness. Andrade himself makes no claim that the evidence is insufficient on this score if the district court's instruction is upheld.

■ The remaining claim of error that we think necessary to address concerns a supplemental instruction given by the district court in answer to a question from the jury. The second count charged Andrade with the substantive offense of transporting firearms without a license into a state of residence. Following the charge and a period of deliberation, the jury submitted a written question to the court as follows:

> The jury requests a description of clarification of the term "transport" as it is used in Page 22 of the Jury instructions, i.e.: Does defendant have to personally transport or deliver guns? Is (sic) acceptance of said guns in Massachusetts constitute transportation, especially in the phrase "to transport into" or "receive"?

After consulting with the parties, the district court told the jury that, given the government's theory of the case, it would not be enough for the jury to conclude that the defendant "merely received or accepted guns in Massachusetts."[5] However, the court said that Andrade would be guilty if he had caused "an agent, employee or other associate" to bring the guns into Massachusetts. Andrade's counsel, in turn, objected to this further supplemental instruction.

The supplemental charge was legally correct. At common law one is liable as a principal if one deliberately causes or procuring another to perform a criminal act, 2 W.R. LaFave & A.W. Scott, Jr., *Substantive Crim-*

*inal Law* § 6.6(a), at 126 (1986), and the principle has been carried forward by 18 U.S.C. § 2(b). Unlike aiding and abetting liability, *id.* § 2(a), there is no requirement that the intermediary be shown to be criminally liable. Section 2(b) is not a separate offense but a general principle of liability that applies without any need for reference in the indictment. *United States v. Sabatino,* 943 F.2d 94, 99–100 (1st Cir.1991).

■ Andrade says that delivering the instruction after closing arguments violated Fed.R.Crim.P. 30, which requires that the court rule on requested instructions "prior to their arguments to the jury." By its terms and, as a matter of necessity, Rule 30 refers only to rulings on instructions requested by counsel "[a]t the close of the evidence or at such earlier time" as the court directs. Fed. R.Crim.P. 30. The rule simply does not prescribe the procedure for supplemental instructions after the jury has retired. *See United States v. Fontenot,* 14 F.3d 1364, 1368 (9th Cir.), *cert. denied,* 513 U.S. 966, 115 S.Ct. 431, 130 L.Ed.2d 343 (1994).

■ The defense now says that at least it should have been allowed to address the jury on this "new theory," pointing out to it that there was no specific evidence that anyone had transported the guns at Andrade's direction. We agree that a refusal to permit further argument made necessary by a supplemental instruction could amount to error. But here it is enough to say that no such request to make further closing argument after the supplemental instruction was made in this case.

Further, the notion of prejudice is fanciful. Defense counsel pointed out to the jury in her original closing that there was no direct evidence showing Andrade's transportation of the guns to Massachusetts. It had to be equally clear to the jury that there was no direct evidence that Andrade had asked an "agent, employee or other associate" to

---

5. In his original instructions, the trial judge had already told the jury—consistent with the indictment—that the charge against Andrade had as a necessary element that he had transported the guns into Massachusetts. However, earlier the judge had quoted the statute in full, and the statute makes transportation *or* receipt criminal, if other conditions are met—which may explain the jury's question.

transport the guns for him. To spell out the obvious would have added nothing.

At the same time, there was enough evidence for a jury to conclude that *somehow* Andrade had managed to get Mississippi guns to Boston; among much else, Andrade had told Todd and Smith that he planned to do so, and some of the guns had in fact been recovered here. The government had no obligation to prove the means of transportation. In context, the supplemental instruction did little more than make this clear to the jury, and properly so.

There is no need to address in detail Andrade's final attack on the trial judge's instructions; taken as a whole, we do not believe the charge tended to mislead or confuse the jury. Although Andrade's arguments have not prevailed, we think it fair to note that several of them are substantial and that Andrade has been represented on this appeal with singular skill and ingenuity.

*Affirmed.*