UNITED STATES of America,
Appellee,

v.

Bounket THONGSOPHAPORN,
Defendant, Appellant.

No. 06–1667.

United States Court of Appeals,
First Circuit.

Heard May 11, 2007.

Decided Sept. 19, 2007.

Paula D. Silsby, United States Attorney, and Margaret D. McGaughey, on brief for appellee.

Christopher Goddu for appellant Bounket Thongsophaporn.

Before BOUDIN, Chief Judge, HOWARD, Circuit Judge, and SAYLOR,* District Judge.

---

\* Of the District of Massachusetts, sitting by designation.

1. The motion to suppress was referred to a Magistrate Judge. After a hearing at which the agents and defendant testified, the Magistrate Judge made various factual findings; among other things, he did not credit defendant's testimony as to several disputed issues.

SAYLOR, District Judge.

This is an appeal of a criminal conviction for drug-related offenses and the resulting sentence. Defendant-appellant Bounket Thongsophaporn contends that the district court erroneously denied his motion to suppress certain statements that he contends were improperly taken after he asserted his post-arrest right to remain silent. He also contends that the district court erroneously applied a two-level enhancement under the sentencing guidelines for possession of a dangerous weapon. Because we find that the district court properly denied the motion to suppress and that the application of the sentencing enhancement was not clearly erroneous, we affirm.

## I. *Background*[1]

On March 25, 2005, Bounket Thongsophaporn was arrested in Brunswick, Maine. He was taken to the police station and placed in an interview room. Agents Reginald Walker, Katherine Barnard, and Jonathan Richards of the Maine and U.S. Drug Enforcement Agencies were with him in the room. Barnard told defendant that they had evidence that he distributed drugs. She also read him his *Miranda* rights, with the help of a Laotian interpreter, who was available by telephone. Defendant indicated that he understood his rights and that he understood English, but that he did not want to waive his rights or talk with the agents. Barnard and Richards then left the room.

The district court then affirmed the recommendation of the Magistrate Judge. Defendant does not appeal those findings and, in any event, we find no clear error. *See United States v. Burns*, 15 F.3d 211, 216 (1st Cir. 1994). The facts are set forth as found by the Magistrate Judge.

Walker, however, remained in the room with defendant. He sat approximately three to five feet away from him at the interview table. Other agents came and went from the interview room. After approximately five minutes of silence, defendant asked for water. He was provided with Coca–Cola. Either before or after he received the drink, defendant asked Walker "what was going on." Walker replied that "he knew why he was in the position he was in now." Defendant said that the agents wanted him "to set up the 'Big One.' " Walker asked what he meant; defendant responded that the agents wanted him to help get a cocaine dealer.

At that point, Walker told defendant that the agents would like to talk with him, but that he had refused to answer questions. Walker also said that defendant could answer some questions and refuse to answer others. Defendant said that he wanted to talk. Defendant expressed concern for his daughters and may have asked if he would be released if he cooperated. Walker then summoned Barnard and Richards back into the room.[2]

When Barnard entered the room, she asked defendant whether he wanted to speak with the agents. Defendant replied that he did. Barnard repeated the *Miranda* rights, again with the help of a Laotian interpreter by telephone. Defendant stated that he understood his rights, wanted to waive them, and wanted to speak with the agents.[3] Barnard stayed for a few minutes, and then left the room.

Defendant told Walker and Richards that he had cocaine and thousands of dollars of cash in his home. He said that he had two ounces of cocaine in his freezer, ten ounces of cocaine in a cereal box near a blue pickup truck, and another ten ounces of cocaine by the spare tire in the rear bed of the truck. He also said that there was $9,000 cash located in a box near his bed and an additional $1,500 in a closet near his shoes. Defendant also told the agents about the source of his supply and a woman to whom he sold cocaine named Mary Gargan.

According to defendant, a person named "Addi" lived in the rear bedroom of his house. He had seen Addi with a gun three months earlier. However, Addi was not inside defendant's home when he saw him with the gun. Defendant informed the agents "if there are guns in the house at all, they would be in Addi's room."

After the interview was completed, defendant was driven to the Portland office of the DEA. He continued to answer questions along the way.

Barnard used the information defendant provided to obtain a warrant to search his house and his pickup truck that same day. In defendant's house, the agents found drugs and cash. In the rear bedroom, they found a loaded handgun, 17 rounds of ammunition, and an unloaded shotgun.

Defendant was charged with various co-

---

**2.** Barnard submitted an affidavit stating that five minutes had elapsed from the time she left the room until the time she returned; she testified at the hearing, however, that fifteen minutes had elapsed. The Magistrate Judge concluded that approximately five minutes of silence passed before defendant asked for a drink, but did not make a finding as to the total time elapsed. For the reasons stated below, the inconsistency, if any, is not material.

**3.** Defendant said that he would speak to the agents without a translator and would tell them if he was having difficulty speaking or understanding. Defendant does not contend that there was any language barrier when he was read his rights or during his subsequent conversation with the agents.

caine-related offenses.[4] He filed a motion to suppress the statements made at the Brunswick police station and on the way to Portland. As noted, that motion was referred to a Magistrate Judge, who recommended denying it after an evidentiary hearing. The district court then adopted the recommendation. After a jury trial, defendant was found guilty of all counts on November 30, 2005.

During the trial, the government introduced a photograph lineup with a picture of a man it believed was Addi Insoban, defendant's roommate. Gargan—the woman to whom defendant admittedly supplied cocaine—identified the man in the lineup as a person she met and gave money to at defendant's request. However, she did not identify him by name. No other witness at the trial identified Addi or the man in the photograph.

At sentencing, the government requested a two-level enhancement under U.S.S.G. § 2D1.1 based upon the guns found at defendant's home. At the sentencing hearing, the government introduced the lineup photograph, with the following colloquy:

> Your Honor, introduced at trial as Government's Exhibit 16A was a photo lineup which contained the photograph of an individual named Addi Insoban (sic), who we believe to be the person that the defendant was referring to. I have marked as Government's Exhibit S1 for sentencing that photo lineup that was introduced at trial. It depicts Mr. Insoban in seat number six and we believe that's appropriate for sentence.
>
> THE COURT: Any objection?
>
> DEFENSE COUNSEL: No, Your Honor.

THE COURT: They are both admitted. The government then offered a portion of the trial transcript, with the following description:

> I would also like to offer into evidence what I've marked as S2 which is a copy of a portion of the trial transcript in which Ms. Gargan testified regarding the note she wrote on the photo lineup. Above Mr. Insoban's photo it said "met and talked, gave money" and Ms. Gargan indicated at trial that she, in fact, gave money to that person depicted in picture number six, Addi Insoban, and that she was instructed to do so by Bob who, as the Court knows from trial, is the defendant, and I would like to offer S2 into evidence.

Again, defendant did not object to its admission.

Although defendant argued at the sentencing hearing that the evidence did not support a two-level enhancement, he did not object to the government's statement that the person in the lineup photograph was Addi Insoban. The court concluded that there was sufficient evidence to establish the required nexus between the guns and the drug offense and applied the enhancement.

## II. *Discussion*

### A. *Motion to Suppress*

Under the *Miranda* doctrine, police must advise a suspect who is in custody of his right to counsel and his right to remain silent. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Where a suspect asserts his right to counsel or to remain silent, further interrogation may not take place "unless the accused himself initiates further communi-

---

4. Specifically, defendant was charged with: (1) conspiracy to possess and distribute more than 5 kilograms of cocaine; (2) distribution of more than 500 grams of cocaine; (3) distribution of cocaine; and (4) possession with intent to distribute cocaine.

cation, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *accord Oregon v. Bradshaw,* 462 U.S. 1039, 1044, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). The "critical safeguard" of *Miranda* is a suspect's " 'right to cut off questioning.' " *Michigan v. Mosley,* 423 U.S. 96, 103, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), *quoting Miranda,* 384 U.S. at 474, 86 S.Ct. 1602. By cutting off questioning, a suspect can "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation," all of which "counterac[t] the coercive pressures of the custodial setting." *Id.* at 103–04, 96 S.Ct. 321.

■ The "admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " *Id.* at 104, 96 S.Ct. 321. In making that determination, courts must consider the "totality of the circumstances." *United States v. Barone,* 968 F.2d 1378, 1384 (1st Cir.1992).

■ The question presented here is whether the defendant freely initiated further communications with law enforcement (and the subsequent questioning was therefore lawful) or whether he was improperly coerced or pressured into making those communications. As noted, defendant initially stated that he did not wish to answer any questions. Agent Walker then sat silently in the room with him. Approximately five minutes later, he requested a drink. At some point shortly thereafter, he asked Agent Walker "what was going on." That question led to further discussions, and in turn to a second *Miranda* warning and the subsequent interrogation.

Under the circumstances, we conclude that defendant initiated further communication of his own free will, without undue coercion or pressure, and that therefore subsequent interrogation was permissible.[5]

■ It is well-settled that law enforcement may resume questioning a defendant in custody who has exercised his right to remain silent if the defendant subsequently initiates further discussions about the investigation. *See, e.g., Bradshaw,* 462 U.S. at 1044, 103 S.Ct. 2830. In *Bradshaw,* the defendant received *Miranda* warnings and exercised his right to remain silent. He then asked a question similar to the one asked by defendant here: "What is going to happen to me now?" *Id.* at 1042, 103 S.Ct. 2830. The Supreme Court found that the question permitted law enforcement to resume discussions with the defendant, as it "evinced a willingness and a desire for a generalized discussion about the investigation" and "was not merely a necessary inquiry arising out of the incidents of the custodial relationship." *Id.* at 1045–46, 103 S.Ct. 2830. *See United States v. Conley,* 156 F.3d 78, 81–83 (1st Cir.1998) (no violation where defendant initiated resumed conversation, asking "what is going on" and "what have you guys got on me, what's this all about?"); *United States v. Trimble,* 986 F.2d 394, 396–401 (10th Cir.1993) (same, where defendant "asked the agents what was going on"); *see also United States v. Taylor,* 985 F.2d 3, 6–8 (1st Cir.1993) (no violation where defendant asked, "why is this happening to me?" prior to receiving *Miranda* warnings).

■ In an attempt to distinguish *Bradshaw,* defendant contends that Walker improperly coerced him into conversation by

---

**5.** As noted, defendant was again apprised of his *Miranda* rights, which he waived prior to substantive questioning. Defendant does not

challenge that waiver except insofar as it was the product of the prior exchange between Walker and defendant.

exerting "subtle psychological pressure." That pressure, according to defendant, consisted of remaining in the interrogation room and staring silently at him.[6] It is true that the *Miranda* doctrine applies to both "express questioning or its functional equivalent," that is, "words or actions ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *See Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Nonetheless, the agent's mere silent presence in the room is insufficient to rise to the level of unlawful coercion or pressure. Indeed, because the agent was required to avoid discussions concerning defendant's legal situation, it is hard to find any fault at all in his silence. While silence may feel awkward or uncomfortable under some circumstances, there is no requirement that the police engage in small talk. Nor was the agent required to exit the room and leave the defendant unsupervised. *See United States v. Andrade,* 135 F.3d 104, 106–07 (1st Cir.1998) (upholding admission of statements obtained following period in which the defendant did not want to answer questions and slept while officer remained in room).

██ Defendant also contends that an insufficient amount of time passed between the point at which he asserted his *Miranda* rights and the point at which interrogation resumed. In *Mosley,* the Supreme Court found that the defendant's rights had been "scrupulously honored" in part because the police resumed questioning only after several hours had passed— an amount of time that the Court deemed "significant." 423 U.S. at 106, 96 S.Ct. 321. However, as this court has observed,

"[n]owhere in its opinion does the *Mosley* Court suggest that the threshold test of admissibility varies depending upon the amount of time that has passed since a suspect invoked the right to silence." *Barone,* 968 F.2d at 1383. Rather, the passage of time is but one factor to consider in the "totality of the circumstances." *Id.* The key inquiry remains whether defendant "was in charge of the decision whether and to whom he would speak." *Andrade,* 135 F.3d at 107. Here, it was the defendant, not the agent, who decided to initiate communications, and the fact that he did so relatively quickly after asserting his rights is irrelevant.

In summary, there was nothing improper about Walker's presence in the room or his silence. At no time did Walker attempt to resume questioning or persuade defendant to speak. Defendant was the one who initiated the conversation about his situation. And defendant was read his *Miranda* rights for a second time once he told the agents that he wanted to talk. Under the circumstances, there was no constitutional violation and the district court did not err in denying defendant's motion to suppress.

### B. *Weapons Enhancement*

#### 1. *Standard of Review*

██ Factual determinations made during the course of sentencing a defendant are reviewed for clear error, keeping in mind that "such determinations need only be supported by preponderant evidence." *United States v. McDonald,* 121 F.3d 7, 9 (1st Cir.1997). Because the district court's application of the sentencing guidelines in a given case is a "fact-sensi-

---

6. Defendant contended below that Walker stared at him from a position of close physical proximity, about three feet away. He also contended that Walker promised him leniency and that defendant made the critical state- ments before the second *Miranda* warning. The Magistrate Judge, however, found his testimony as to those issues not credible, a finding not challenged on appeal.

tive matter," it is also subject to clear-error review. *Id.*

### 2. *Analysis*

 The sentencing guidelines provide for a two-level enhancement in drug offenses when a defendant possesses a dangerous weapon, including a firearm. U.S.S.G. § 2D1.1(b)(1). According to the commentary, "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1) comment n. 3.[7]

 The guidelines thus require the establishment of a "certain nexus" between the weapon and the offense for the enhancement to apply. *United States v. Lagasse,* 87 F.3d 18, 22 (1st Cir.1996). To do so, "the prosecution need only prove that the defendant possessed the weapon during the currency of the offense, not necessarily that he actually used it in perpetrating the crime or that he intended to do so." *McDonald,* 121 F.3d 7, 10 (1st Cir.1997). Thus, "when the weapon's location makes it readily available to protect either the participants themselves during the commission of the illegal activity or the drugs and cash involved in the drug business, there will be sufficient evidence to connect the weapons to the offense conduct." *United States v. Corcimiglia,* 967 F.2d 724, 727 (1st Cir.1992); *accord McDonald,* 121 F.3d at 10; *Lagasse,* 87 F.3d

at 22; *United States v. Ovalle–Marquez,* 36 F.3d 212, 225 (1st Cir.1994).

 The sentencing enhancement also applies whenever a co-defendant's possession of a firearm in furtherance of a joint-criminal venture is "reasonably foreseeable." *United States v. Bianco,* 922 F.2d 910 (1st Cir.1991).[8] Because firearms are considered "common tools of the drug trade," a co-defendant's possession of a dangerous weapon "is foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an exchange of controlled substances for a large amount of cash." *Id.*[9]

Here, the district court concluded that the guns found in the rear bedroom belonged to Addi, that Addi was a member of a drug conspiracy with the defendant, and that Addi's possession of the guns was reasonably foreseeable to the defendant. The evidence as to the latter two points was the following: (1) defendant's home was the center of drug activity; (2) Addi lived in the rear bedroom of the home; (3) defendant knew that Addi had guns; (4) one of defendant's drug customers met the person depicted in the lineup photograph and gave him money at defendant's request; and (5) the person in the photograph was Addi.

 At the trial, there was no evidence as to the identity of the person in the lineup photograph. At the sentencing,

---

7. In construing the sentencing guidelines, the Sentencing Commission's commentary and application notes are given substantial weight. *See Stinson v. United States,* 508 U.S. 36, 42–46, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993).

8. U.S.S.G. § 1B1.3(a)(1) requires the sentencing court to consider "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable." Defendants are accountable for "reasonably foreseeable" con-

duct undertaken in furtherance of a joint criminal venture, "whether or not [the crime is] charged as a conspiracy." U.S.S.G. § 1B1.3.

9. The prosecution bears the initial burden of proving by a preponderance of the evidence that a weapon was possessed in connection with a drug offense. *McDonald,* 121 F.3d at 10. The burden then shifts to the defendant "to persuade the factfinder that the connection between the weapon and the crime is clearly improbable." *Id.*

 

however, the government introduced the photograph and the relevant trial transcript, both times stating on the record that the person depicted in the photograph was Addi. Counsel for defendant did not object to the admission of the evidence or to the government's representation, or indeed argue to the court that the person in the photograph was not Addi.[10] Under the circumstances, the district court appropriately credited the government's representation, and concluded that Addi was involved in defendant's drug trafficking activities.[11]

The question, then, is whether the district court properly inferred a nexus between the presence of the guns in the house and the drug trafficking operation. A sentencing court may make reasonable inferences from the facts in evidence as long as "a rational connection" exists "between the facts proved and the fact presumed." *Bianco*, 922 F.2d at 912. While the evidence of a drug conspiracy between defendant and Addi is not overwhelming, the necessary "rational connection" exists here. *See, e.g., Corcimiglia,* 967 F.2d at 727; *McDonald,* 121 F.3d at 10. Indeed, this court has held that the "mere presence of a firearm in the same residence which is used as a site for drug transactions *may* allow a sentencing court to make the inference that the weapon was present for the protection of the drug operation." *Corcimiglia,* 967 F.2d at 727.

Accordingly, the application of the two-level enhancement for possession of a dangerous weapon was not clearly erroneous,

and the decision of the district court will not be overturned. *Affirmed.*

---

**10.** In fact, defense counsel assumed that fact to be true, arguing that there was no evidence that Addi and defendant were co-conspirators "other than [Gargan's] statement that she had given him—she had met and given him money."

**11.** Other than in "extreme cases," factual issues not raised either in an objection to the presentence memorandum or during the sentencing hearing cannot be challenged for the first time on appeal. *See, e.g., United States v. Haggert,* 980 F.2d 8, 11 (1st Cir.1992).