# United States Court of Appeals
## For the First Circuit

No. 09-2362

DAVID N. GRANT,

Petitioner, Appellant,

v.

WARDEN, MAINE STATE PRISON,

Respondent, Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Christopher K. MacLean, with whom Elliot & MacLean, LLP, was on brief, for appellant.
Donald W. Macomber, Assistant Attorney General, with whom Janet T. Mills, Attorney General, was on brief, for appellee.

August 17, 2010

**LIPEZ**, **Circuit Judge**.  Petitioner David N. Grant was convicted of the murder of his mother-in-law after a jury trial in the Maine Superior Court.  The Maine Supreme Judicial Court (SJC) affirmed his conviction, see State v. Grant, 939 A.2d 93 (Me. 2008), and the federal district court denied his petition for writ of habeas corpus.  Grant appeals from the denial of his petition, contending that the SJC's rejection of his claim that law enforcement officers obtained incriminating statements from him in violation of his Fifth Amendment right to remain silent was an unreasonable application of clearly established federal law.  After careful consideration, we affirm.

## I.

We summarize the facts as recounted by the SJC, supplementing with additional facts from the record to the extent they are consistent with the SJC's account.  See Lynch v. Ficco, 438 F.3d 35, 39 (1st Cir. 2006).  We "must 'accept the state court findings of fact unless [Grant] convinces us, by clear and convincing evidence, that they are in error.'"  Id. (quoting McCambridge v. Hall, 303 F.3d 24, 26 (1st Cir. 2002) (en banc) (citing 28 U.S.C. § 2254(e)(1))).  Grant does not contend on appeal that the state court's factual findings were in error.

On the afternoon of November 30, 2004, Grant ingested about a half-ounce of cocaine and then drove to the home of his mother-in-law, Janet Hagerthy, in Farmingdale, Maine.  Following an

-2-

argument, Grant attacked Hagerthy, tied her hands behind her back, loaded her into his pick-up truck, and dumped her in a field. Her body was found the following day and a later autopsy indicated the cause of death to be blunt force trauma and blood loss from stab wounds.

Around 11:30 p.m. on the night of November 30, law enforcement officers were dispatched to the scene of a single vehicle accident, where they found Grant's pick-up truck in a ditch off the side of the road. Grant was moving around in the cab of the truck, waving a knife and repeatedly plunging it into his throat. The officers shocked Grant several times with a taser to subdue him, then wrestled away Grant's knife, handcuffed him, and removed him from the truck. Grant was cuffed and secured to a long board and transported by ambulance to Eastern Maine Medical Center, where he had emergency surgery.

Grant's surgery was completed early on the morning of December 1. In the hours after his surgery, detectives repeatedly attempted to interview him. During the first three attempts, made on the morning of December 1, Grant was not conscious or lucid enough to make a statement. The first interview began at 4:26 a.m., just after Grant's surgery. Detectives explained that they wanted to talk with Grant about his mother-in-law and attempted to advise Grant of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), but terminated the interview because he was not coherent.

-3-

During the second interview attempt at 9:51 a.m., another detective, David Tripp, explained that he was investigating the Hagerthy case and advised Grant of his Miranda rights. Grant responded that he did not want to talk and his throat was sore. At 11:45 a.m., Tripp returned and re-read Grant his Miranda rights. Grant again said that he did not want to talk because his throat was sore and indicated that he could not write because his hands were sore.

Detective Tripp returned at 1:42 p.m. that afternoon and administered a new set of Miranda warnings. Grant acknowledged his rights and had the following exchange with Tripp:

> Detective: Okay. Now, having all those rights which I just explained to you in mind, do you wish to answer questions at this time?
> Grant: No.
> Detective: What's that?
> Grant: No.
> Detective: No?
> Grant: (inaudible) answer any questions.
> Detective: What's that?
> Grant: I don't want to answer any questions.
> Detective: You don't want to answer any questions?
> Grant: No.

At that point, Tripp immediately stopped questioning Grant. Tripp proceeded to explain that he was investigating the homicide of Janet Hagerthy and that he and another detective from the Evidence Response Team were going to collect evidence from Grant, including fingernail clippings, a blood sample, and penile swabs. Tripp showed Grant the warrant authorizing the search and stated, "So, um

if you don't want to talk with me, that's fine.  That's your right, you don't have to talk with me.  Um . . . we're gonna go ahead and process the evidence."  The detectives then executed a search of Grant's body, during which they took hand and nail swabs, nail clippings, pubic hair combings, a penile swab, and a blood sample.

At 9:03 a.m. the next morning, December 2, after learning from Grant's nurses that he had not been given pain medication since the previous afternoon, Tripp attempted another interview of Grant.  Tripp again advised Grant of his <u>Miranda</u> rights, and Grant acknowledged his rights and agreed to talk with Tripp.  After answering several questions, Grant stated, "I don't know if I should tell you without a lawyer.  I just don't know, David [Tripp], you know?"  Tripp responded, "That's totally up to you."  When Grant repeated that he did not know, Tripp again explained,

> And you know, that's why I read you the <u>Miranda</u> rights.  Um . . . it . . . it's totally up to you.  I'm not going to . . . to tell you that you have to talk to me, obviously, because you don't have to. . . . I will tell you the last paragraph in that says that . . . that you can talk to me and if you decide to stop talking to me at any point, that you can say I don't want to talk anymore.  Um . . . you know, so that's . . . that's totally up to you and I want to be very clear on that, David [Grant]. I'm not here twisting your arm or anything.  You know there are certain things that we obviously . . . we obviously know. . . You know that this is what we do for a living.

Grant then continued to answer questions, and during the ensuing interrogation he made a number of incriminating statements about

his involvement in the killing of his mother-in-law.[1]  At 9:47 a.m., Grant stated, "I mean I know I've already told you enough to hang me . . . but I think I'd really like to have a lawyer present." Tripp promptly terminated the interrogation. Later that day, Grant was released from the hospital and arrested. Throughout Grant's hospital stay on December 1 and 2, law enforcement officers were stationed in the hallway outside his room.

On December 29, 2004, a grand jury indicted Grant for murder, see Me. Rev. Stat. Ann. tit. 17-A, § 201(1)(A).  Prior to trial, Grant moved to suppress his statements from the December 2 interview, contending that he had repeatedly invoked his Miranda rights on December 1 and that his December 2 statements were obtained in violation of his Fifth Amendment right to remain silent.  Following an evidentiary hearing, the motion court denied his motion to suppress.  The court concluded that Grant was not in custody until after the 1:42 p.m. interview on December 1 when detectives executed a search warrant on his body, and further found that he did not unequivocally invoke his right to remain silent during any of the December 1 interviews.  A jury found Grant guilty

---

[1] For example, Grant admitted that he had gone over to his mother-in-law's house after ingesting about a half-ounce of cocaine and they had had an argument.  Grant then said to Tripp, "I really don't know what happened.  I just totally lost it, I don't know why.  I don't know what I've done. I know it's gotta be pretty bad."  He later stated, "I knew I was about . . . I knew I exploded . . . I don't know what I did, Dave [Tripp], I really don't."

of murder and the court sentenced him to a term of seventy years' imprisonment.

The SJC affirmed Grant's conviction, holding that the trial court did not err in denying Grant's motion to suppress his December 2 statements. However, the SJC rejected the motion court's reasoning and instead held, following an extensive analysis of the facts, that Grant was in custody throughout his stay at the hospital and that he unambiguously invoked his right to remain silent during the 1:42 p.m. interview on December 1.[2] Grant, 939 A.2d at 103-04. The court further reasoned that law enforcement officers "scrupulously honored" Grant's invocation of his right to remain silent before renewing interrogation the following morning, and therefore his December 2 statements were properly admitted at trial. Id. at 107 (citing Michigan v. Mosley, 423 U.S. 96 (1975)). The SJC denied Grant's motion for reconsideration.

Grant filed a petition for writ of habeas corpus in federal district court, see 28 U.S.C. § 2254, on the sole ground that his December 2 statements were obtained in violation of his Fifth Amendment right against self-incrimination. The district

---

[2] The SJC further concluded that Grant's refusals to answer questions during the 9:51 a.m. and 11:45 a.m. interviews on December 1 were not unambiguous invocations of his Miranda rights "because he indicated, after being asked, that he did not want to answer questions due to his sore throat and hands." Grant, 939 A.2d at 103 n.6. Grant does not challenge that conclusion here and therefore we do not address it.

court denied relief, but granted a certificate of appealability. See 28 U.S.C. § 2253(c). This appeal followed.

## II.

### A. Standard of Review

We review the district court's denial of Grant's habeas petition de novo. Abrante v. St. Amand, 595 F.3d 11, 15 (1st Cir. 2010). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief as to claims adjudicated on the merits in state court unless the state court decision either (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). Only the first prong of the AEDPA standard, 28 U.S.C. § 2254(d)(1), is at issue here.

A state court decision is "contrary to" clearly established law if the court "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). Alternatively, a state court adjudication involves an "unreasonable application of" clearly established law if the court "identifies the correct governing

legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Thus, the "unreasonable application" clause "reduces to a question of whether the state court's derivation of a case-specific rule from the [Supreme] Court's generally relevant jurisprudence appears objectively reasonable." O'Laughlin v. O'Brien, 568 F.3d 287, 299 (1st Cir. 2009) (quotation marks and citations omitted). Under this deferential standard, "'the state court's decision is not vulnerable unless it evinces some increment of incorrectness beyond mere error.'" Abrante, 595 F.3d at 15 (quoting Foxworth v. St. Amand, 570 F.3d 414, 425 (1st Cir. 2009)); see also Williams, 529 U.S. at 411 ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

## B. Clearly Established Federal Law

Grant's claim under AEDPA relies on the clearly established law of Miranda and Mosley.[3] In Miranda, the Supreme Court held that once a suspect in custody invokes his right to

---

[3] This case involves the question of when the police may renew interrogation after a suspect's invocation of the right to remain silent, not after a suspect's invocation of the right to counsel. Thus, the Supreme Court's recent decision in Maryland v. Shatzer, 130 S. Ct. 1213 (2010), addressing the resumption of police questioning after a suspect invokes the right to counsel, is not relevant here.

remain silent, law enforcement officers must cease interrogating the suspect. 384 U.S. at 473-74. The Court reasoned that at that point the suspect "has shown that he intends to exercise his Fifth Amendment privilege," and therefore "any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." Id. at 474.

In Mosley, the Supreme Court addressed a question left unresolved by Miranda: when, if ever, law enforcement officers can resume questioning after a suspect has invoked the right to remain silent. The Court rejected a per se ban on further interrogation, concluding that such a prohibition "would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." Mosley, 423 U.S. at 102. Instead, the Court reasoned that the "critical safeguard" identified in Miranda was the suspect's "'right to cut off questioning.'" Id. at 103 (quoting Miranda, 384 U.S. at 474). The requirement that law enforcement officers respect the suspect's exercise of that right "counteracts the coercive pressures of the custodial setting," allowing the suspect to "control the time at which questioning occurs, the subjects

-10-

discussed, and the duration of the interrogation." Id. at 104, 103. Therefore, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" Id. at 104.

Applying this general standard, the Mosley Court examined the circumstances leading to the defendant's confession and held that law enforcement officers "fully respected" his right to cut off questioning. Id. The Court found that after the defendant invoked his right to remain silent, law enforcement officers "immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time [more than two hours] and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." Id. at 106. Thus, this was not a case in which officers failed to honor the suspect's decision to cut off questioning "either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." Id. at 105-06.

## C. Analysis

Grant primarily contends that the SJC's conclusion that law enforcement officers "scrupulously honored" his right to cut off questioning was an unreasonable application of Miranda and Mosley. We disagree, concluding that the SJC's application of the

-11-

general standard announced in Mosley to the particular facts of Grant's case falls within the broad limits of reasonableness. See Yarborough v. Alvarado, 541 U.S. 652, 663 (2004) (noting that the more general the standard established by the relevant Supreme Court jurisprudence, "the more leeway courts have in reaching outcomes in case-by-case determinations").

The SJC thoroughly analyzed whether law enforcement officers scrupulously honored Grant's invocation of his right to remain silent, focusing on the same considerations found significant in Mosley. In particular, the court broke the Mosley analysis into four factors, each of which it viewed as a nondispositive consideration in the ultimate inquiry of whether Grant's invocation was scrupulously honored: "(1) whether police immediately cease the interrogation when the defendant invokes the right to remain silent; (2) whether a significant amount of time passes before questioning is resumed; (3) whether fresh Miranda warnings are provided; and (4) whether the later interrogation is restricted to matters distinct from the former." Grant, 939 A.2d at 104-105 (internal quotation marks omitted).

The SJC found that several relevant factors weighed in favor of admission of Grant's December 2 statements. After Grant invoked his right to remain silent during the 1:42 p.m. interrogation on December 1, Detective Tripp immediately ceased questioning and did not further pressure Grant to speak. Tripp did

-12-

not attempt to resume questioning until the following day, at which time he administered a full new set of Miranda warnings. A "significant period of time," over nineteen hours, elapsed between the 1:42 p.m. invocation and the resumption of questioning at 9:03 a.m. the next day. See Mosley, 423 U.S. at 106 (finding two hours to be a "significant period of time"). During this nineteen-hour interval, Grant was recovering from injuries but was not given any additional pain medication, allaying concerns that medication interfered with his ability to clearly evaluate his circumstances. On the other hand, the SJC acknowledged that the 1:42 p.m. interrogation and the 9:03 a.m. interrogation the next day involved precisely the same issues, a factor that weighed against admission of the December 2 statements.

After examining the circumstances leading to Grant's incriminating statements, the SJC concluded that "taken as a whole, the conduct of the police did scrupulously honor Grant's invocation" of his right to remain silent. Grant, 939 A.2d at 107. We cannot say that the SJC's weighing of the nondispositive factors discussed in Mosley was objectively unreasonable. See, e.g., United States v. Lugo Guerrero, 524 F.3d 5, 12 (1st Cir. 2008) (holding post-invocation statements admissible under Mosley where officers immediately stopped questioning after invocation, conducted second interview nearly four hours later, gave defendant a new set of Miranda warnings, and treated defendant well at all

-13-

times, even though first and second interviews concerned same crime); United States v. Andrade, 135 F.3d 104, 106-07 (1st Cir. 1998) (finding post-invocation statements admissible where officer stopped questioning after defendant indicated unwillingness to speak, another officer resumed questioning several hours later after asking defendant if he remembered his rights, and there was no "undue pressure" on defendant to talk, but first interview was related to same crime as second).

Grant contends that the SJC's conclusion was unreasonable in light of evidence that Tripp "took steps to undermine Grant's decision to invoke his right to remain silent," a relevant consideration under Mosley. Grant emphasizes that after he declined to answer questions during the 1:42 p.m. interview, Tripp explained that he would be executing a search of Grant's body, showed Grant the search warrant, and then executed the search. Grant also stresses that after he expressed doubts about whether to continue answering questions during the 9:03 a.m. interview, Tripp responded, "I'm not here twisting your arm or anything. You know there are certain things that we obviously . . . we obviously know . . . . You know that this is what we do for a living."

However, the SJC expressly concluded that after Grant invoked his right to remain silent during the 1:42 p.m. interview, the detective promptly ceased the interrogation "without further badgering or pressure to speak." Grant, 939 A.2d at 106. Viewing

-14-

Tripp's statements and actions in context, we cannot say the SJC was unreasonable in concluding that Tripp did not try to wear down Grant's resistance or pressure him to speak, but instead fully respected his invocation of the right to remain silent. <u>Cf.</u> <u>United States</u> v. <u>Barone</u>, 968 F.2d 1378, 1384 (1st Cir. 1992) (excluding post-invocation statements where officers "repeatedly spoke to [defendant] for the purpose of changing his mind, failed to provide new <u>Miranda</u> warnings, applied pressure by emphasizing the danger he would face in Boston if he did not cooperate, and took advantage of a long delay in arraignment").

Grant further contends that the SJC's adjudication of his Fifth Amendment claim "was an unreasonable application of <u>Mosley</u> as interpreted by the First Circuit."[4] He argues that in evaluating whether law enforcement officers "scrupulously honored" his invocation of the right to remain silent, the SJC relied exclusively on the four factors enumerated in its opinion. Grant contends that the SJC's reliance entirely on these four factors is inconsistent with First Circuit decisions, which have described the

---

[4] We note that the certificate of appealability (COA) granted by the district court framed this issue in similar terms. The COA was granted as to two issues:

> 1. Whether the Law Court's factor analysis approach was an unreasonable application of <u>Mosley</u> as interpreted by the First Circuit; and,
> 2. Whether the Law Court erred in holding that Mr. Grant's <u>Miranda</u> rights were scrupulously honored by police in accordance with <u>Mosley</u>.

factors highlighted in <u>Mosley</u> as part of a "totality of the circumstances" analysis of whether the defendant's right to cut off questioning was scrupulously honored.  See, <u>e.g.</u>, <u>Lugo Guerrero</u>, 524 F.3d at 12; <u>United States</u> v. <u>Thongsophaporn</u>, 503 F.3d 51, 57 (1st Cir. 2007); <u>Barone</u>, 968 F.2d at 1384.

However, this line of argument rests on a mistaken premise.  The relevant question under AEDPA is not whether the SJC's decision involved an unreasonable application of <u>Mosley</u> "as interpreted by the First Circuit," but whether the SJC unreasonably applied "clearly established Federal law, <u>as determined by the Supreme Court of the United States</u>." 28 U.S.C. § 2254(d)(1) (emphasis added).  Under AEDPA, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by" the Supreme Court. <u>Knowles</u> v. <u>Mirzayance</u>, 129 S. Ct. 1411, 1419 (2009) (quotation marks and citations omitted).[5]

---

[5] Of course, this is not to say that decisions from this and other courts cannot inform our analysis under 28 U.S.C. § 2254(d)(1).  For example, "[d]ecisions from the lower federal courts may help inform the AEDPA analysis to the extent that they state the clearly established federal law determined by the Supreme Court." <u>Aspen</u> v. <u>Bissonnette</u>, 480 F.3d 571, 574 n.1 (1st Cir. 2007).  In addition, "factually similar cases from the lower federal courts may inform" a determination of whether a state court decision involves an unreasonable application of clearly established Supreme Court jurisprudence, "providing a valuable reference point when the relevant Supreme Court rule is broad and applies to a kaleidoscopic array of fact patterns." <u>Rashad</u> v. <u>Walsh</u>, 300 F.3d 27, 35 (1st Cir. 2002); <u>see</u> <u>also</u> <u>Phoenix</u> v. <u>Matesanz</u>, 233 F.3d 77, 83 n.3 (1st Cir. 2000) ("Although decisions issuing from this Court are not 'clearly established' for the

-16-

We have characterized <u>Mosley</u> as applying a totality of the circumstances test to the question of whether the defendant's invocation of the right to remain silent was scrupulously honored. We think that is a fair reading of <u>Mosley</u> in light of the language that introduces the Supreme Court's analysis of the specific facts relevant in that case. There, the Supreme Court stated that "[a] review of the circumstances leading to Mosley's confession reveals that his 'right to cut off questioning' was fully respected in this case." <u>Mosley</u>, 423 U.S. at 104. However, the Supreme Court has never expressly characterized its test as a totality of the circumstances test. The SJC chose to read <u>Mosley</u> as setting forth a four-factor test, and noted that "[e]ven after the First Circuit indicated that examining the totality of the circumstances was appropriate, we have relied entirely on the identified factors." <u>Grant</u>, 939 A.2d at 105 n.8. Despite our own reading, we cannot say that the SJC's application of <u>Mosley</u> was unreasonable.

Moreover, Grant has not shown that the SJC's four-factor approach unreasonably constrained its analysis of the ultimate question under <u>Mosley</u>: whether Grant's right to cut off questioning was scrupulously honored. As discussed above, the SJC examined the circumstances leading up to Grant's incriminating December 2 statements, finding that Tripp promptly stopped the interrogation

purposes of § 2254(d)(1) because they do not issue from the Supreme Court, they provide significant insight on what constitutes reasonableness for a particular fact pattern.").

-17-

after Grant's December 1 invocation, did not further badger or pressure Grant to answer questions, resumed questioning over nineteen hours later after administering a new set of Miranda warnings, and confirmed that Grant had not been given additional medication during this interval. The SJC concluded that these circumstances demonstrated that law enforcement officers fully honored Grant's invocation. Grant, 939 A.2d at 107. Grant argues generally that a four-factor approach "forecloses any consideration of the surrounding circumstances," but he does not point to any relevant factual circumstances that the SJC failed to consider in its analysis. Thus, regardless of whether the SJC described its analysis as a "totality of the circumstances" test or a four-factor test, its conclusion was not an unreasonable application of Mosley.[6]

### III.

For the foregoing reasons, the judgment of the district court is affirmed.

So ordered.

---

[6] Grant also suggests that the SJC took a purely "numerical approach" to the Mosley analysis and concluded that "three out of four factors favoring the state equals scrupulous honoring." This is not an accurate characterization of the SJC's decision. The SJC made clear that the considerations found significant in Mosley "are considered as nondispositive factors that militate in favor of, or against, a conclusion that a suspect's invocation has been scrupulously honored," and noted that the substantive analysis was the same even if it was broken into fewer or more than four factors. Grant, 939 A.2d at 105 & n.7.